IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE HOUSTON AMERICAN ENERGY CORP. SECURITIES LITIGATION | § § § | CIV. A. NO. H-12-1332 |
| This Document Relates to<br><br>ALL ACTIONS | § § § § § | CLASS ACTION |

## OPINION AND ORDER

Pending before the Court in the above referenced, putative federal securities class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), brought on behalf of persons other than Defendants who purchased Houston American Energy Corp. common stock between November 9, 2009 and April 18, 2012 (the putative "Class Period"), is Defendants Houston American Energy Corp. ("Houston American"), John F. Terwelliger, James J. Jacobs, John P. Boylan, Orrie Lee Tawes III, and Stephen Hartzell's motion to dismiss (instrument #53; memorandum, #54) the Amended Consolidated Class Action Complaint[1] ("Amended Complaint") of Lead Plaintiffs Paul Spitzberg and Stephen Gerber, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rules of Civil Procedure 9(b) and 12(b)(6).  Plaintiffs seek to recover damages and pursue remedies under §§ 10(b) and 20(a) of the Securities

---

[1] Instrument #44.

-1-

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78(j)(b)[2] and 78t(a) respectively,[3] and Securities Exchange Commission

---

[2] Section 78(j)(b) provides, "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

[3] Section 78t(a)("Joint and several liability; good faith defense") provides,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

To demonstrate controlling person liability plaintiffs must show that a primary violation of § 10(b) was committed and that the defendants directly or indirectly controlled the violator. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 348 n.57, 362 n.123 (5th Cir, 2001). The controlling person does not have to have participated in the underlying primary violation. *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981). Section 20(a) liability is derivative and "cannot exist in the absence of a primary violation." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 383 (5th Cir. 2004). Thus Plaintiffs must first adequately plead with particularity a primary violation of § 10(b). *Id.* at 383-84.

("SEC") Rule 10b-5[4] (C.F.R. §240.10b-5), promulgated thereunder, against Houston American and some of its officers and directors.

After carefully reviewing the Amended Complaint, the briefs, and the applicable law, although the adequacy of the pleading is a close question, for the reasons stated below the Court finds that Defendants' motion to dismiss for failure to state a claim for which relief can be granted should be granted.

**Standards of Review**

Federal Rule of Civil Procedure 8(a)(2) provides, "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts

---

[4] Rule 10b-5 states,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

as true. *Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763
(5th Cir. 2011), *citing Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir.
2009).

"While a complaint attacked by a Rule 12(b)(6) motion to
dismiss does not need detailed factual allegations, . . . a
plaintiff's obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a cause
of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, 127
S. Ct. 1955, 1964-65 (2007)(citations omitted). "Factual
allegations must be enough to raise a right to relief above the
speculative level." *Id.* at 1965, *citing* 5 C. Wright & A. Miller,
*Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed.
2004)("[T]he pleading must contain something more . . . than . . .
a statement of facts that merely creates a suspicion [of] a legally
cognizable right of action"). "*Twombly* jettisoned the minimum
notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . .
(1957)["a complaint should not be dismissed for failure to state a
claim unless it appears beyond doubt that the plaintiff can prove
no set of facts in support of his claim which would entitle him to
relief"], and instead required that a complaint allege enough facts
to state a claim that is plausible on its face." *St. Germain v.
Howard*,556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina
Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive

a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974).   "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010), *quoting Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009).   The plausibility standard is not akin to a "probability requirement," but asks for more than a "possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556.  Dismissal is appropriate when the plaintiff fails to allege "'enough facts to state a claim to relief that is plausible on its face'" and therefore fails to "'raise a right to relief above the speculative level.'"  *Montoya*, 614 F.3d at 148, *quoting Twombly*, 550 U.S. at 555, 570.

In *Ashcroft v. Iqbal*, 129 S. Ct. at 1940, the Supreme Court, observed "the tenet that "only a complaint that states a plausible claim for relief survives a motion to dismiss," a determination involving "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" under Rule 12(b).  *Iqbal*, 129 S. Ct. at 1949.  The plaintiff must plead specific facts, not merely conclusory allegations, to avoid

dismissal. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief . . . ." *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421 (5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006).

"Rule 12(b) is not a procedure for resolving contests about the facts or the merits of a case." *Gallentine v. Housing Authority of City of Port Arthur, Tex.*, ___ F. Supp. 2d ___, Civ. A. No. 1:12-CV-417, 2013 WL 244651, *3 (E.D. Tex. Jan. 22, 2012), *citing* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure:  Civil 2d* § 1356, at 294 (1990).

As noted, on a Rule 12(b)(6) review, although generally the court may not look beyond the pleadings, the Court may examine  the complaint, documents attached to the complaint, and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s), as well as matters of public record.  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010), *citing Collins*, 224 F.3d at 498-99; *Cinel v. Connick*, 15 F.3d 1338, 1341, 1343 n.6 (5th Cir. 1994).  *See also United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003)("the court may consider . . . matters of which judicial notice may be taken"). Taking judicial notice of public records directly relevant to the issue in dispute is proper on a Rule 12(b)(6) review and does not

-6-

transform the motion into one for summary judgment. *Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

In addition to Rules 8(a) and 12(b)(6), fraud claims must also satisfy the heightened pleading standard set out in Federal Rule of Civil Procedure 9(b): "In allegations alleging fraud . . ., a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." A dismissal for failure to plead with particularity as required by this rule is treated the same as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). The Fifth Circuit interprets Rule 9(b) to require "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess, Inc.,* 407 F.3d 690, 696 (5th Cir. 2005). *See also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)("To satisfy Rule 9(b)'s pleading requirements the plaintiffs must ;specify the statements contended to be fraudulent, identify

the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'")(*quoting Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997)).

"When a corporation is alleged to have made false representations, the court must [identify and] look to 'the state of mind of the corporate official or officials who make or issue the statement.'  It follows that '[a] corporation can be held to have a particular state of mind [e.g., fraudulent intent] when that state of mind is possessed by a single individual.'" *7-Eleven Inc. v. Puerto Rico-7 Inc.*, Civ. A. No. 3:08-CV-00140-B, 2008 WL 4951502, *2 (N.D. Tex. Nov. 19, 2008), *quoting Southland Sec. Corp.*, 365 F.3d 353, 366-67 (5th Cir. 2004).

Private litigants who bring securities fraud claims must also satisfy the pleading requirements of the PSLRA before any discovery is allowed.  "To state a securities fraud claim under section 10(b) and Rule 10b-5, plaintiff must plead (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which the plaintiffs relied,[5] and (5) that proximately caused the

---

[5] "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008).  Proof of reliance insures that there is a proper "connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988).  A plaintiff can demonstrate reliance by showing that he was aware of the misrepresentation and purchased stock based on it. A plaintiff may also invoke a rebuttable presumption of reliance by

plaintiff's injuries. *Southland*, 365 F.3d at 362. For a misrepresentation to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.". *Basic Inc. v. Levinson*, 485 U.S. 224, 231-31 (1988). "The appropriate inquiry is whether, under all the circumstances, the omitted fact or prediction without a reasonable basis 'is one [that] a reasonable investor would consider significant in [making] the decision to

---

invoking the "fraud-on-the-market" theory, i.e., "the market price of shares traded on well-developed markets reflects all publicly available information," including material misrepresentations. *Id.* at 246. Because the market "transmits information to the investor in the processed form of a market price," it is presumed that an investor relies on public misstatements whenever he "buys or sells stock at the price set by the market." *Id.* at 242. To invoke the rebuttable presumption, the plaintiffs must show that "the alleged misrepresentations were publicly known (else how would the market take them into account?), that the stock traded in an efficient manner, and that the relevant transaction took place 'between the time the misrepresentation were made and the time the truth was revealed.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185 (2001), *citing Basic Inc.*, 485 U.S. at 248 n.27. "Any showing that severs the link between the misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic Inc.*, 485 U.S. at 248.

The element of reliance in a private Rule 10b-5 action is called "transaction causation," to be distinguished from "loss causation," which requires the plaintiffs to show that the misrepresentation that affected the market price also caused the plaintiff's subsequent economic loss. *Id.* at 2186. "While reliance focuses on the front-end causation question of whether the defendant's fraud induced or influenced the plaintiff's stock purchase, loss causation provides the 'bridge between reliance and actual damages.'" *FindWhat Investor Group v. FindWhat.com*, 658 F. 3d 1282, 1311 (11th Cir. 2011), *citing In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628, 638 (C.D. Cal. 2009).

invest, such that it alters the total mix of information available about the proposed investment.'" *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994), *quoting Krim v. BancTexas Group*, 989 F.2d 1435, 1445 (5th Cir. 1993).

For false statements of a material fact or a misleading omission of material fact, Plaintiffs must "specify each statement alleged to have been misleading and the reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 15 U.S.C. § 78u-4(b)(2). *See also ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 351 (5th Cir, 2001)("To summarize, a plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud clam must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) and 78u-4(b)(3)(A):   (1) specify each statement alleged to have been misleading, *i.e.*, contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.  Additionally, under 15 U.S.C. § 78u-4(b)(1), for allegations made on information and

belief, the plaintiff must:  (7) state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief.").

Plaintiffs must also "state with particularity facts giving rise to a strong inference that defendants acted with the required state of mind," scienter, i.e., "not merely simple or even inexcusable negligence," but instead a mental state embracing "intent to deceive, manipulate, or defraud,' or that 'severe recklessness' in which the danger of misleading buyers or sellers . . . is either known to the defendant or is so obvious that the defendant must have been aware of it.'"  15 U.S.C. § 78u-4(b)(2); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004), *quoting Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 19881)(*en banc*). To determine whether a plaintiff has adequately pleaded scienter under the PSLRA, all facts must be evaluated collectively, not in isolation, and the "court must take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008), *citing Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "[T]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences. . . . Yet the inference of scienter must ultimately be 'cogent and

compelling,' not merely 'reasonable' or 'permissible'" that Defendants acted with intent to deceive, manipulate, or defraud or with severe recklessness in making the challenged statements. *Id., quoting id.* at 323. The Fifth Circuit has rejected the contention that allegations of motive and opportunity standing alone will satisfy the scienter requirement, but it has found that they may meaningfully enhance the strength of the inference of scienter. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009)(*citing Ind. Elec.*, 537 F.3d at 533), *cert. denied*, 558 U.S. 873 (2009).

The Fifth Circuit has also rejected group pleading of scienter and requires the plaintiffs to plead facts showing "the state of mind of the individual corporate official or officials 'who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'" *Id., citing id.* Where the corporate documents have no stated author or statements with the documents are not attributed to any individual, a corporate officer's signature on the document is sufficient to charge the document to him. *Southland*, 365 F.3d at 365. "[T]he corporation itself may be treated as making press releases and public statements issued by authorized officers on its behalf, and

statements made by its authorized officers to further the interests of the corporation." *Id.*

Under the PSLRA a plaintiff must prove that the defendant's act or omission alleged to have violated the Exchange Act caused the loss for which the plaintiff seeks to recover damages. 15 U.S.C. § 78u-4(b)(4). To establish loss causation an investor must plead facts showing a causal relationship between his damages and the defendant's material misstatement or omission. The Supreme Court has held that the traditional elements of proximate causation and economic loss must be alleged to establish loss causation under § 10(b). *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). For loss causation the plaintiff may not simply allege that the price of security on the date of purchase was inflated because of the alleged misrepresentation. *Id.* at 342 ("as a matter of pure logic, at the moment that a transaction takes place, the plaintiff [who has purchased securities at an inflated price] has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." (emphasis in original)). Nor does a decline in stock price following a public announcement of bad news, by itself, demonstrate loss causation supporting a securities fraud claim. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. An investor must show that the misstatement or omission *itself* is the actual cause of his economic loss, as opposed to changed economic circumstances,

changed investor expectations, new industry-specific facts, conditions, or other events." *Dura Pharms.*, 544 U.S. at 342; *see also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, (5th Cir. 2009)("The loss must be caused because this truth 'ma[de] its way into the marketplace,' not as a result of 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions' or other factors independent of the fraud."), *citing Dura Pharms.*, 544 U.S. at 342-43.  The Fifth Circuit requires that a plaintiff must allege either (1) a "facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciations of the stock and plaintiff's loss" or (2) "enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation." *Lormand*, 565 F.3d at 258. "[L]oss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009).  The Fifth Circuit has ruled that notice pleading under Rules 8(a) and 12(b)(6), not heightened pleading, is sufficient to plead loss causation.

## Factual Allegations of the Amended

## Consolidated Class Action Complaint (#44)

Defendant Houston American's business is the exploration for and production of oil and natural gas in the United States, specifically developing concessions in properties in the Gulf Coast Region, principally Texas and Louisiana, and in the  South American country of Colombia.[6]     Defendant John F. Terwilliger ("Terwilliger") has been its Chief Executive Officer, President, and Chairman of the Board of Directors since April 2001.  Defendant Jay Jacobs ("Jacobs") has been Houston American's Chief Financial Officer since July 2006.  Defendant John Boylan ("Boylan") has acted as a financial consultant to the oil and gas industry since 2007, served in a number of executive capacities in the industry in both the exploration and production and in the oil services sectors.  A licensed CPA, Boylan has advised Houston American about its industry, operations, and operating environment.  Defendant O. Lee Tawes III ("Tawes") has served as a director of Houston American since 2005; and Defendant Stephen Hartzell ("Hartzell"),[7] since 2005.[8].  Houston American has three employees:  Defendant

---

[6] Houston American is a Delaware corporation with headquarters in Houston, Texas.  It is a public company whose stock trades on the New York Stock Exchange under the symbol "HUSA."  #53 at p. 3.

[7] Boylan, Tawes and Hartzell are members of Houston American's Board of Directors.  #53 at p.4.

[8] Defendant Edwin Broun, III ("Broun") was voluntarily dismissed without prejudice by Lead Plaintiffs on December 11,

Terwilliger, Defendant Jacobs, and Senior Vice President of Exploration Kenneth A. Jeffers ("Jeffers").

This suit focuses on Houston American's lease of the first of three exploration and production blocks in Llanos Basin, Columbia: (1) the 345,452-acre CPO 4 block, in which are located the C7 and C9 formations in the Tamandua #1 well; (2) the La Cuerva block of about 48,000 acres; and (3) the LLA 62 block of about 40,000 acres.

The Consolidated Class Action Complaint represents that Houston American, which had a 37% interest in the CPO 4 block, engaged SK Innovation Co., which held a 50% interest in the CPO 4 block, and Gulf United Energy, which had a 13% interest, as partners for its exploration activities in the CPO 4 block. According to one of Plaintiffs' five unnamed but briefly described "Confidential Witnesses,"[9] the partners formed a management

_____

2012.  #48, 52.

[9] Confidential Witness 1 is a petroleum engineer with thirty-eight years of experience, working for Petrotech Engineering Ltd. in Vancouver, B.C., as well as a consultant for fourteen years to the British Columbia Securities Commission on oil and gas issues. He was hired by Houston American to evaluate oil reserves in the Llanos basin in Colombia.  He reported to CEO and Chairman Terwilliger and to Kenneth Jeffers, Senior Vice President of Exploration and Houston American.

Confidential Witness 2 was Executive Vice President of Corporate Development and Chief Financial Officer of Shona Energy, a Houston-based oil and natural gas exploration company that explores in South America, especially Columbia and Peru.  Shona invested in Houston American and two other companies in the Serrania Block in Columbia, but not in the CPO 4 block.

Confidential Witness 3 is a geophysicist and was Senior Vice President of Americas for SK Innovation Co. from January 2011 to June 2012, as well as the management representative from SK

committee composed of the following individuals to lead the exploration, decide where to drill and the number of wells to drill, as well as how deep to drill:  Terwelliger, Jacobs, Confidential Witness 3, Ernest B. Miller (Executive Vice President of Gulf United Energy), Jim Ford (Executive Vice President of Gulf United Energy), and Jeffers.

According to Confidential Witness 3, a technical committee of the following people met regularly in Houston to review the progress at the CPO 4 block and to discuss the next steps, communicating almost daily by phone and email:  Terwilliger, Jacobs, Jeffers, Ford, Gulf United Executive Vice President of Exploration James Fluker ("Fluker"), Confidential Witness 3, and Confidential Witness 4.

Plaintiffs explain that the Guidelines for Application of the Petroleum Resources Management System ("PRMS") is a joint effort of the Society of Petroleum Engineers, the American Association of Petroleum Geologists, the World Petroleum Council, and the Society

---

Innovation Company on the partners' management committee that made the decisions about the exploration, drilling, and production of the wells on the CPO 4 block.  He was responsible for managing the drilling operation of the CPO 4 block.

Confidential Witness 4 was former SK Exploration and Development and Production Global's drilling manager from January 2012.  He had access to and reviewed reports and analyses about the progress of the drilling in CPO 4.

Confidential Witness 5 was the global engineering advisor for SK Exploration and Production starting in January 2012, about the time that SK Exploration Company was preparing to test the Tamandua well for hydrocarbons.

of Petroleum Evaluation Engineers to provide definitions and
guidelines "designed to provide a common reference for the
international petroleum industry, including national reporting and
regulatory disclosure agencies, and to support petroleum project
and portfolio management requirements.  They are intended to
improve clarity in global communications regarding petroleum
resources." #44 at p. 12.  PRMS defines "reserves" as

> those quantities of petroleum anticipated to be
> commercially recoverable by application of development
> projects to known accumulations from a given date forward
> under defined conditions.  Reserves must further satisfy
> four criteria:  they must be (1) discovered, (2)
> recoverable, (3) commercial, and (4) remaining (as of the
> evaluation date) based on the development project(s)
> applied.  Reserves are further categorized in accordance
> with the level of certainty associated with the estimates
> and may be sub-classified based on project maturity
> and/or characterized by development and production
> status.

#44 at pp. 12-13.  Under PRMS,

> To be included in the Reserves class, there must be a
> high confidence in the commercial productibility of the
> reservoir as supported by actual production or formation
> tests.  In certain cases, Reservoirs may be assigned on
> the basis of well logs and/or core analysis that indicate
> that the subject reservoir is hydrocarbon-bearing and is
> analogous to reservoirs in the same area that are
> producing or have demonstrated the ability to produce on
> formation tests.

*Id.* at p. 13.  In contrast, "'resources' are a broader category
that encompass all quantities of petroleum naturally occurring on
or within the Earth's crust, discovered and undiscovered
(recoverable or unrecoverable), as well as quantities already

-18-

produced.[10]  Resources also include all types of petroleum, whether considered 'conventional' or 'unconventional.'"  *Id.*  The PRMS does not allow companies to aggregate estimates of "reserves" with those of "resources":

> Petroleum quantities classified as Reserves, Contingent Resources, or Prospective Resources should not be aggregated with each other without due consideration of the significant differences in the criteria associated with their classification.  In particular, there may be a significant risk that accumulations containing Contingent Resources and/or Prospective Resources will not achieve commercial production.

#44 at p. 13.  Plaintiffs allege that Houston American falsely represented its recoverable oil reserves to investors and knowingly disregarded industry standards on recoverable oil reserves.[11]

---

[10]  In their memorandum (#54 at p. 16), Plaintiffs emphasize that the distinction between "resources" and "reserves" is the likelihood that a company can get any oil out of the ground in commercial quantities, a fact that undoubtedly is material to investors. They charge that by representing that CPO 4 contained an estimated 1 to 4 billion barrels of estimated recoverable "reserves," Defendants falsely led investors to believe that there was a high level of confidence in the commercial producibility of barrels of oil from CPO 4, when they had no idea if it was true. *Id.*  Plaintiffs also point out that Defendants do not deny Confidential Witness 1's statement that Houston American failed to conduct any tests in CPO 4 that were required by industry standards to substantiate the presence of reserves nor that PRMS's definition of reserves is the industry standard "designed to provide a common reference for the international petroleum industry, including national reporting and regulatory disclosure agencies." #54 at p. 23, citing #44, ¶ 42.  They suggest that Defendants appear to concede that they did not adhere to PRMS when making their public statements about the recoverable reserves in CPO 4. *Id.*

[11]  In their motion to dismiss (#53 at p. 13), Defendants object that Plaintiffs' argument rests entirely on the assumption that the term "reserves" used by Houston American has the same meaning as the PRMS assigns to it.  Highlighting the fact that the PRMS

In September 2010, Houston American hired Confidential Witness

---

definition requires a "high confidence in the commercial producibility of the reservoir as supported by actual production and formation tests," Defendants insist the definition does not apply because when it made the estimate of 1-4 billion barrels, Houston American had just acquired its interest in CPO 4 and had not yet drilled a well, had no production data, and repeatedly disclosed in its SEC filings and press releases that it might not discover hydrocarbons in commercially viable filings. Moreover the PRMS definition closely tracks the definition of reserves applicable to SEC filings. On the first page of the investor presentation that the document uses, Houston American states that the document uses certain terms "that the SEC guidelines strictly prohibit us from including in filings with the SEC" and that "[t]hese terms include reserves with substantially less certainty, and no discount or other adjustment is included in the presentation of such reserved numbers." #53 at p. 15, citing Exhibit H and Exhibit I at 1.

Furthermore Defendants point out that Houston American's SEC filings disclose its proved oil and natural gas reserves. #54, Ex. J (Form 10-K for fiscal year ended December 31, 2009, filed on March 16, 2010); Ex. K (highlighted excerpts of Form 10-K for fiscal year ended December 31, 2009, filed on March 29, 2010). They state that these reserve figures are prepared by an independent engineering firm and that Plaintiffs do not challenge these figures. If Plaintiffs believed their contention that the estimate in the November 2009 presentation refers to reserves where there is "high confidence in the commercial productibility . . . as supported by actual production or formation tests," they would have realized their mistake when Houston American filed its 10-K showing approximately 1.2 million barrels of proved developed and proved undeveloped reserves in Colombia. In addition the November 2009 presentation shows that (1) Houston American had just acquired its interest in CPO 4; (2) the estimate is based on "leads and prospects" from seismic data (and not a reference to "reserves" as defined by PRMS), which are clues and places to go looking for oil, not discovered oil; and (3) that SK and Houston American had not yet drilled any wells on CPO 4 and would not do so until obtaining additional 3D seismic data for the block. #53 at p. 16, and Ex. I at pp. 12, 34 (discussing 3D seismic to be completed by December 2010 and Houston American's share of the seismic cost). Because Plaintiffs' allegations of falsity are based solely on Confidential Witness 1's statement that there were no reserves, as defined by PRMS, in the well, Plaintiffs have failed to plead an actionable material misstatement, maintain Defendants.

1, who reported to Terwilliger and Jeffers.  Pursuant to
Terwilliger's instructions, the engineer did not evaluate available
reserves in CPO 4, but performed only a paper document review of
the resources of the Llanos basin and did not conduct any tests of
his own in the field, but instead relied on existing seismic data,
geological maps, and other records.  The engineer reported that
Terwilliger did not want the engineer to do a risk assessment of
the Lanos basin resources.  As a result, he performed a "limited
scope examination" in accordances with the Society of Petroleum
Engineers and produced a written report without a risk assessment
even though he believed "there could be a lot of risks in drilling
in an area like that."  In fact the engineer thought there were
"numerous" risks in that basin.  An article dated October 19, 2010,
published on LaRepublica.com.co, reported that Confidential Witness
1 prepared a document stating that some of Houston American's
estimates of oil reserves were not supported by official data or
available evidence.  In short, Confidential Witness 1 evaluated
only resources, not reserves, for the CPO 4 block and even stated
"there were no reserves" for the CPO 4 block.  He also stated that
it was impossible to evaluate the oil reserves in the CPO 4 block
because no drilling had begun and thus there was no history of oil
production from which to evaluate its oil reserves.  When
specifically asked if Houston American had a legitimate reason to
characterize its oil resources in the CPO 4 block as "oil

reserves," he answered that Houston American had "never reached the point where they could call the oil resources there 'reserves.'"

Despite the fact that Houston American had no basis to estimate oil reserves at the time of, or prior to, Confidential Witness 1's evaluation in September 2009 because there was no oil production data, Plaintiffs allege that Houston American falsely stated in investor presentation materials filed with the SEC on November 9, 2009 on Form 8-K, signed by Jacobs, that CPO 4 block contained huge amounts of oil reserves, i.e., approximately 1-4 billion barrels.

The partnership's management committee purportedly continually disagreed about how to proceed with drilling in the CPO 4 block. Plaintiffs' Confidential Witness 3 joined Houston American in January 2011 when it was "at the stage prior to drilling wells." Confidential Witness 3 reported that he had disagreements with Houston American and that the partners also disagreed about where to drill the wells and about economic justification for drilling them, with SK less optimistic than Houston American about the prudence of doing so based on Confidential Witness 3's review of the seismic data, which Confidential Witness 3 explained significantly lowered SK's expectations for the CPO 4 block. SK wanted to drill only two wells, but Houston American and Terwilliger insisted on three, according to Confidential Witness 3. The management committee finally agreed to three wells in CPO 4

block despite the conflict among members.  It chose to drill Tamandua first, a second well, initially called Negretos, in the southeast, and a third on the eastern side.

Plaintiffs claim that Defendants knowingly failed to conduct the necessary tests for reporting recoverable oil reserves in CPO 4, for which drilling had to have been commenced--in actuality drilling in CPO 4 did not begin until mid 2011.  Instead Defendants only conducted tests to determine "resources," and Defendants knew that they did not have the requisite information and data to report "reserves."

Drilling began on the Tamandua #1 well in July 2011, but problems quickly mounted.  The well bit got stuck repeatedly and, according to Confidential Witness 3, the engineers were unable to determine why, so finally the management committee unanimously chose to sidetrack the well twice even though sidetracking increased the cost.

During this time Defendants issued statements that mainly attributed the delays to the "inflow of hydrocarbons" and claimed that "a significant amount of geological risk has been reduced." They also issued positive statements that they found "a very significant show of hydrocarbons with some oils" and characterized these shows as "very, very positive."  Confidential Witnesses 3 and 4 stated that Houston American never found a "significant" or strong show of hydrocarbons."  They reviewed the geological tests

and records and did not find any evidence of hydrocarbon shows at any time.  Based on his review, Confidential Witness 4 stated that Houston American had never made any findings of "strong shows of hydrocarbons" or significant hydrocarbons," and that "[t]here was no indication of gas or oil," while Confidential Witness 3 corroborated that statement, observed that any hydrocarbons found "were not strong" and explained that it was not "factual" to represent that the well had "oil."

As the drilling continued, the cost went $30 to $50 million over budget and took seven months instead of two.  When the drilling reached 16,000 feet in December 2011, it hit rock and there was still no sign of oil.  At that point, according to Confidential Witness 3, the committee decided to end the drilling effort because "it was obvious that we had to stop.  It was decided in a telephone call.  We couldn't go any further."  The partners had SK Innovation Co. conduct a well test, which takes about three weeks, and it did not find flowable hydrocarbons in Tamandua, reported Confidential Witness 3, who further observed, "We [SK] didn't think the probability of finding hydrocarbons justified the cost."

Houston American and Gulf United Energy decided to do another well test on a "sole risk basis," i.e., do it themselves at their own expense, while SK decided not to participate because it did not think the probability of finding hydrocarbons justified the cost.

That second round of tests of fluids at the bottom of the well in February or March 2012 found nothing, according to Confidential Witness 3. So they abandoned the first well and moved on to Negretos in the south, according to Confidential Witness 3.

Confidential Witness 5 joined SK in January 2012, approximately the time when SK Exploration was preparing to test the Tamandua well for hydrocarbons and reported on it. He stated that the results of the C9 formation tests conducted by the partners around February 2012 were very disappointing and "there was nothing commercial there. . . . There was no continuous flow." #44 at p. 17.

Confidential Witness 4 also started working for SK in January 2012. When the team drilled a six-inch hole and planned to do two tests, a C9 formation and a C7 formation, he confirmed that the results of the former were so disappointing that SK decided not to proceed further. Confidential Witness 4 further stated that "[t]he results were very, very poor."

The technical committee reviewed the results of the drilling operation on the CPO 4 block. Confidential Witness 4 reviewed the geological tests and records and did not find evidence of strong hydrocarbon shows at any time. He reported that Houston American and Gulf United spent approximately $5 million on the second round of tests of the C7 formation, which took more than two weeks, only to be disappointed again. The committee then decided to abandon

the well.

Plaintiffs then specifically detail the alleged materially misleading or false representations made by Houston American during the Class Period about the amount of recoverable oil reserves in the CPO 4 block, specifically in the C7 and C9 formations in the Tamandua #1 well, when there were no grounds for reporting recoverable oil reserves there.  As the Amended Complaint's newly added claim, they assert that on November 9, 2009 Houston American filed a Form 8-K with the SEC signed by Jacobs.  It included slides prepared by Houston American for an investor presentation held that day regarding Houston American's oil exploration prospects.  *Inter alia*, it made the materially false or misleading statement in dispute: "CPO 4 Block consists of 345,452 net acres and contains over 100 identified leads or prospects with estimated reserves of 1 to 4 billion barrels."[12]  Plaintiffs allege that Confidential

---

[12] In their motion to dismiss (#53 at p.14), Defendants respond *inter alia* that any claims based on this single sentence in a 38-page presentation, taken out of context by Plaintiffs, is protected by the PSLRA's safe harbor for forward-looking statements.  Title 15 U.S.C. § 78u-5(c)(1)(A)(i)-(iii) states

(c) Safe harbor

    (1) In general

    Except as provided in subsection (b) of this
    section, in any private action arising under
    this chapter that is based on an untrue
    statement of a material fact or omission of a
    material fact necessary to make the statement
    not misleading, a person referred to in
    subsection (a) of this section shall not be

Witness 1 stated, "There were no reserves."  Thus Defendants had no basis for claiming in the Form 8-K filed on November 9, 2009 that the CPO 4 block contained "100 identified leads or prospects with estimated recoverable reserves of 1 to 4 billion barrels." Moreover they never retracted or qualified the estimate.  Houston American's stock, in response, increased over 10%, rising from $3.95 to $4.35 on November 10, 2009 and reaching $4.83 by November 16, 2009, a 22% increase.

In April 2010 financial publications began questioning Houston

---

liable with respect to any forward-looking statement, whether written or oral, if and to the extent that--

(A) the forward looking statement is--

(1) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial . . .

Where such a statement is not accompanied by cautionary language, a defendant may still claim safe harbor if plaintiff fails to show that the defendant made the statement with "actual knowledge" as to its falsity.  *Id.* at § 78u-5(c)(1)(B).  The Fifth Circuit has held that actual knowledge by the defendants of the falsity of the statement will defeat the safe harbor defense.  *Lormand*, 565 F.3d at 244 ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provisions is inapplicable."); *Southland*, 365 F.3d at 371 ("To avoid the safe harbor, plaintiffs must plead facts demonstrating that the statement was made with actual knowledge of its falsity.").

American's disclosures.   On April 7, 2010 an internet publication called "Seeking Alpha" posted an article entitled "Houston American Energy Corp. Set for Collapse" on its website questioning the value of Houston American stock and its "over-hyping" of the CPO 4 block, from which the complaint (#44 at pp. 19-23) quotes extensively and which the Court incorporates herein.   Plaintiffs claim that the article caused the value of the stock to drop $5.84 per share on a very heavy trading volume to close at $14.51 on April 7, 2010. Houston American responded with a press release denying the allegations.   Then on June 25, 2010, it announced that Defendant Broun had resigned for "personal and health reasons."[13]

On June 28, 2010, a website called Sharesleuth.com posted an article entitled, "Small Texas Company promotes big South American oil venture," which the Court incorporates herein (#44 at pp. 24-25) and which strongly criticized, indeed maligned, Houston American's management[14] and also doubted the value of the CPO 4

---

[13] This Court notes that scienter may not be inferred from resignation of company officials "for personal reasons." *Branca v. Paymentech, Inc.*, No. Civ. A. 3:97-CV-2507-L, 2000 WL 145083 (N.D. Tex. Feb. 8, 2000). *See also Southland*, 365 F.3d at 382-83; *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 434 & n.28 (5th Cir. 2002).

[14] The article claims that Terwilliger's previous company, Moose Oil and Gas, wound up in bankruptcy, as did Boylan's because he took hundreds of thousands of dollars in loans from the business without the knowledge and consent of his partners.   It charges that Broun was described in court documents as suffering from alcohol-related brain damage and being a recluse who slept all day, drank all night, and had not opened his mail in two years.   A fourth director, Tawes, was involved in Terwilliger's most recent bankrupt company.   The article charged in a detailed account that

block, as well as the truthfulness of Defendants' estimate of 1 to

4 billion barrels of recoverable reserves.  It highlighted the fact

that SK Energy said little about the CPO 4's potential and did not

list the tract among its main exploration and development projects

for 2010.  Houston American stock then fell $1.66 per share to

close at $10.88 per share on June 28, 2010, and on the next day at

$9.95.[15]    Plaintiffs   assert   that   Houston   American   denied   the

accusations and continued making false statements throughout the

Class Period.

In  a  press  release  on  August  16,  2010,  Terwilliger  stated,

"With   our   higher   interest   in   CPO   4   and   other   recent   prospects

---

Terwilliger, who started Houston American in April 2001, and Tawes
allegedly improperly shifted assets out of Moose Oil, characterized
as loans, and used its cash to establish Houston American.  They
also purportedly had Moose Oil issue promissory notes to another
Terwilliger  company,  Marlin  Data  Research,  Inc.  and  to  Tawes,
secured  by  most  of  Moose  Oil's  remaining  oil  and  gas  holdings.
After defaulting on the notes, Moose Oil filed for bankruptcy on
April  9,  2002.   The  bankruptcy  trustee  accused  Terwilliger  of
breach  of  fiduciary  duty,  self  dealing,  and  transferring  assets
"with  actual  intent  to  hinder,  delay,  or  defraud  creditors."
Terwilliger  settled,  agreeing  to  pay  with  Marlin  Data  $100,000.
The trustee also pursued the law firm that set up Houston American,
as well as one of Hartzell's companies.
     The article further states that Boylan was CEO of an oilfield
services  company  called  Birdwell  Partners,  L.P.  and  for  a  period
managed one of its units, Five Star Transportation, LP.  Five Star
closed   after   financially   failing   and   Boylan   was   ousted   by
Birdwell's  other  partners  after  $350,000-$400,000  was  discovered
missing  from  the  checking  accounts  of  Five  Star  and  a  related
business.   Boylan the worked as a manager or consultant for three
different oil companies, all of which filed for bankruptcy.

     [15] Since   these   allegations   are   not   misrepresentations   by
Defendants, they do not support Plaintiffs' §10(b)/Rule 10b-5 cause
of action against Defendants.

acquired in Colombia, we continue to focus on growing our reserves and production as our newer prospects are drilled over the next year." On November 15, 2010 Houston American issued another press release reporting its financial results for the quarter and for the nine months ending September 30, 2010, in which Terwilliger stated,

Houston American Energy enjoyed another strong quarter, highlighted by our continuing success in Colombia where we have participated in drilling seven successful wells, year to date, out of eight wells drilled. Our oil production for the 2010 third quarter increased by 69% from the 2009 third quarter and for the nine months ended September 30, 2010 our oil production was up 224% from the same period in 2009. We have also benefited from a more favorable price environment for oil with average sales price of oil realized increasing 34% for the quarter and 35% for the nine month period. As a result, our revenues were up 122% for the quarter and 332% for the nine month period.

We continue to focus on identifying early stage resource plays where we can participate in large resource potential at lower cost, typified by our Colombian operations. Our belief in the resource potential in Colombia, and in particular our Serrania and CPO 4 prospects, continues to grow. Our belief in that potential has translated into our hiring of an in-house Senior VP of Exploration to focus on development of our Colombian holdings and the decision during the third quarter to increase our stake in the CPO 4 prospect from 25% to 37.5%. We continue to invest in Serrania and CPO 4 and expect drilling of our first wells on Serrania to occur in the near future with drilling on CPO 4 expected to commence in early 2011.

. . . . Together with our cash on hand, proceeds from our sale of Hupecol assets and sale of our Karnes County, Texas working interest leave us well positioned to fund all of our foreseeable development costs on Serrania and CPO 4. . . . Through this approach, we have steadily increased our stakes, and potential reserve finds, in resource plays in Colombia with our interests in Serrania and CPO 4 being 12.5% and 37.5%, respectively, compared to our initial interests in Colombian assets that ranged from 1.6% to 12.5%.

Around December 1, 2010, Terwilliger, representing Houston American in a webcast, stated that CPO 4 and Serrania "create an opportunity of absolutely extraordinary growth."

Defendants argue that as of the dates of each of these materially false or misleading statements, no oil had been discovered in the CPO 4 block.

The SEC began investigating Houston American's potential violations of federal securities laws regarding its purported reserves in October 2010, and the investigation progressed to a formal SEC investigation as of March 1, 2011.  On March 15, 2011 Houston American filed its annual report for the period ending December 31, 2010 on a Form 10-K, which was signed by Terwilliger, Jacobs, Tawes, Hartzell, and Boylan.  Defendants assert that it falsely stated, "We may from time to time be a party to lawsuits incidental to our business.  As of March 1, 2011 we are not aware of any current, pending or threatened litigation or proceedings that could have a material adverse effect on our results of operations, cash flows or financial condition."  Houston American's materially misleading statements, made when Defendants knew they were subject to an SEC investigation concerning the core business of Houston American, allegedly inflated the price of its stock from its closing price of $3.95 at the beginning of the Class Period on November 9, 2009 to a high of $20.44 on July 6, 2011.

In July 2011, Houston American's Management Committee

commenced drilling operations on the first test well prospect in CPO 4.  On October 5, 2011 Houston American filed a Form 8-K signed by Jacobs, which reported problems when the "well encountered a significant kick from the uppermost pays sand" and the "strong inflow of hydrocarbons forced the well to be shut-in and stabilized."  It appeared to compromise the mud system, so it was decided to sidetrack the well and make changes to the well program that would modify the way in which the well would be drilled.  The Form 8-K also stated,

> While the Tamandua #1 is taking longer to drill than anticipated, we believe that a significant amount of geological risk has been reduced in the well and we are very encouraged from the strong shows of hydrocarbons (gas and oil) in the first objective sand, the C-7.  In addition, production from fields around this area in the Llanos Basin is generally associated with stacked pay sequences so we are encouraged about the prospects of our lower sands due to the first objective sand (the C-7) bearing hydrocarbons.  However, despite the information derived from the initial Tamandua #1 wellbore, there is no assurance that we will locate hydrocarbons in sufficient quantities to be commercially viable.

On October 6, 2011 Houston American filed another Form 8-K, signed by Jacobs, that contained investor presentation materials and that stated basically the same information.

The complaint alleges that on October 13, 2011, representing Houston American, Terwilliger participated in a Canncord Genuity Global Energy Conference and misleadingly stated regarding the progress of the CPO 4 drilling operations,

> But the C7, which is the uppermost potential pay sand in the [Carbonara] series.  We had tremendous kick which we

announced and a very significant show of hydrocarbons gas
with some oil.  And that's very interesting because it's
- - geographically you always want your uppermost sand to
have hydrocarbons in it.  That suggests that for
migration you know that you have a good change now if you
have structures below you that there was migration
through those structure.  That's very, very positive.

On November 8, 2011, Houston American filed a Form 10-Q
report, signed by Terwilliger and Jacobs, for the period ending on
September 30, 2011 and reported most of the same information,
including the materially false statement that "the strong shows of
hydrocarbons (gas and oil) in the first objective sand, are
believed to increase the likelihood of hydrocarbons in the lower
sands" and that "we believe the geological risk of the well has
been reduced," although "there is no assurance that we will locate
hydrocarbons in sufficient quantities to be commercially viable."
Houston American's Form-8K filed with the SEC on December 20, 2011
again stated that "[w]hile drilling the secondary objectives in the
sidetrack, the C-7 and C-9 formations, we experienced strong
hydrocarbon shows and an inflow of gas."  This statement led
investors to believe that Defendants had encountered evidence
consistent with the presence of actual oil in the well.  As noted
supra, several witnesses testified that the drilling never produced
any evidence of "strong" or "significant" hydrocarbons nor any oil
shows.  Confidential Witness 3 stated that neither oil nor flowable
hydrocarbons were found in the Tamandua #1 well, while Confidential
Witness 4 represented that in his experience and review of reports

-33-

and analyses of the CPO 4 block, Houston American had never made any findings of "strong shows of hydrocarbons"; in other words, they concluded there was no oil in the CPO 4 block in Tamandua. Confidential Witness 4, the drilling manager of SK Exploration and Production, maintained that the well had not shown any significant amounts of hydrocarbons at any time.

Houston American stopped drilling in December 2011 when it hit rock and could not drill farther. It decided to and did conduct tests of the well in February and March. The first tests were "extremely discouraging" because they did not yield any evidence of flowable hydrocarbons or that the well was a commercial zone. Despite these findings, Defendants kept falsely representing that they had encountered oil shows or other indications of hydrocarbons. For example on March 1, 2012 Houston American presented an update in a press release in a Form 8-K signed by Terwilliger on the Tamandua #1 well, stating that it "exhibited oil shows while drilling, and other indications of hydrocarbons such as log analyses that indicate possible productive sands."

The partners completed hydrocarbon testing on Tamandua #1 well no later than March 2012. Confidential Witness 4 said the testing revealed that the C-9 formation had no oil and that therefore SK decided not to proceed with the testing it had planned in the adjoining C7 formation, but to move on to other projects. Houston American and Gulf United, however, went ahead with the second test,

but, according to Confidential Witness 3, "did not find any
flowable hydrocarbons in Tamandua," indeed found "nothing," and SK
therefore abandoned the well.  Confidential Witness 5 also reported
that "there was nothing commercially viable [in C9]" and "there was
nothing we got to the surface to indicate it was a commercial zone.
There was not continuous flow."

Confidential Witness 2 represented that he had heard from his
contacts in the industry about the issues that Houston American
encountered in the CPO 4 block.  He stated that Houston American
waited about six to eight weeks after encountering these obstacles
to publicly announce that it had stopped efforts to drill in the
Tamandua well.  Confidential Witness 2 further stated that it "took
forever" for Houston American to concede that the well could not be
developed commercially.

Houston American's 2011 Form 10-K annual report filed on March
7, 2012 for the period ending December 31, 2011, signed by
Terwilliger, Jacobs, Tawes, Hartzell, and Boylan, continued to make
false or misleading statements about the CPO 4 development and the
strong presence of hydrocarbons.  *Inter alia* it again stated that
drilling on the first well on the CPO 4 block, the Tamandua #1, was
"sidetracked to address drilling issues associated with high
pressure and inflows of hydrocarbons into the well bore."  Moreover
it reported,

> While the well exhibited oil shows while drilling, and
> other indications of hydrocarbons such as log analysis

that indicate possible productive sands, hole conditions
have prohibited sufficient testing on the bottom hole.
There have been many attempts to evaluate the well
resulting in tool failures and stuck pipe, and current
conditions are such that the operator has made the
decision not to try to reenter the bottom hole sections.
As a result of these developments, the decision has been
made that without the ability to effectively test the
lower zones, the most prudent course of action is to plug
back the well and to further evaluate the C-7 and C-9
Formations.  As indicated by the Logging While Drilling
data, the well encountered approximately 200 feet of net
resistive sands in the C-7 formation and approximately
140 feet of net resistive sands in the C-9 formation
(resistive sands do not necessarily mean pay).

After attempting to complete the well, the rig is
expected to be moved to one of two locations that are
currently permitted and ready to receive the rig.   In
addition, the operator has five additional locations that
are in various stages of permitting, location and
construction.

We anticipate completion of the Tamandua #1 well during
the first quarter of 2012 with well testing and, as
appropriate, completion of the well to follow.  Drilling
of a second test well on the CPO 4 prospect is expected
to commence shortly after completion of the Tamandua #1
well.

As noted, despite repeated representations that the drilling had

produced strong carbon shows, according to Confidential Witness 3

the Tamandua well had not exhibited any oil shows nor produced any

significant amounts of hydrocarbons at any point, and the committee

had stopped drilling in late 2011.  Testing merely confirmed what

Defendants already knew, i.e., that there was no oil in the well

nor any significant evidence of hydrocarbons.  Confidential Witness

4 stated, "I never got the impression from my review of geological

tests and records that there were significant hydrocarbons

discovered along the way."

The 2011 Form 10-K also allegedly falsely stated, "We may from time to time be a party to lawsuits incidental to our business. As of March 1, 2012, we were not aware of any current, pending, or threatened litigation or proceedings that could have a material adverse effect on our results of operations, cash flows or financial condition."  This statement is false and misleading because Houston American admitted on April 19, 2012 that the SEC had issued a nonpublic formal order of private investigation on March 1, 2011, which followed a nonpublic informal inquiry begun by the SEC in October 2010.  As part of the litigation in February and April of 2012 Houston American received three subpoenas issued by the SEC calling for testimony from the CEO and CFO and delivery of specified documents.

On March 1, 2012 Houston American also announced that drilling in the Tamandua #1 well was delayed and that further analysis of the well's C7 and C9 formations would be announced as soon as available.  Houston America stock then fell $3.84 per share, losing more than 35% of its value, to close at $7.00 per share on March 1, 2012.

In a press release on March 16, 2012 to update the status of the Tamandua #1 well in light of "various unfounded rumors," Houston American stated,

> Regarding the Tamandua #1 sidetrack well, the Company
> anticipates that it will be able to announce the test

results of the C-9 and C-7 formations in a matter of days as soon as the information is available.

Regarding rumors currently circulating on message boards, John Terwilliger, Chairman and CEO of the Company, stated, "There is a great deal of speculation and misinformation currently posted on message boards regarding our company. Specifically, I would note that we believe that we have more than adequate cash on hand to fund our portion of anticipated costs of testing and completion of the Tamandua #1 sidetrack well and carrying on with our business plan. Further, statements that we are on the verge of bankruptcy are wholly unfounded. We have no debt on our books and have, what we believe to be, a valuable portfolio of prospects. We remain optimistic about our CPO 4 prospect and other prospects in our portfolio."

In another press release on April 4, 2012, "an operational update on the Company's CPO 4 block and status of the Tamandua #1 well," Houston American announced,

The Company is currently eagerly awaiting the final results of the testing of the Tamandua #1 well and will announce the results as soon as they are available. During preliminary testing of the Tamandua #1 well it has been determined that the C-9 and C-7 formations experienced formation damage as a result of the mud program used to control the well while drilling. The formation damage has resulted in a testing period longer than what was originally anticipated. Although there have been delays with the testing, the Company remains optimistic that these conditions will be overcome and that it will be able to establish a successful test on the Tamandua #1 well.

After testing of the Tamandua #1 well is complete, the drilling rig on location will be moved to the next prospect on CPO 4. All necessary preparations have been completed for the drilling rig to move to the next prospect and begin drilling. These preparations included completion of the surface location and all logistics related to the drilling of the well, including all permitting. It should also be noted that the next prospect located on CPO 4 will be shallower than the Tamandua #1 well and is anticipated to be drilled in less

than 60 days once the drilling rig is on location.
After the release, Houston American's stock fell $0.11 to close at
$4.67 on April 4, 2012.  The stock price continued to fall, closing
at $4.21 on April 5, 2012, $4.06 on April 9, 2012, and $3.67 on
April 9, 2012, the next three trading days.

On April 19, 2012 Houston American in another press release
announced termination of testing and completion efforts on the
Tamandua #1 well "due to formation damage while drilling," and
plans for the next well on the CPO 4 block.  It also disclosed that
the SEC had been investigating it since October 2010 and had issued
it three subpoenas calling for testimony from its chief executive
officer and chief financial officer in addition to delivery of
specified documents.   In part the press release stated.

> The Company is encouraged, however, by the information
> gained from [the Tamandua #1] well for other prospects on
> the block.  The Tamandua #1 wellbore will be preserved in
> a way to allow for further evaluation, if at such time in
> the future it is determined that it is warranted.

> The Company also announced that efforts are commencing to
> move the drilling rig from the Tamandua #1 well site to
> the location of the next prospect on the CPO 4 block.
> This next well is expected to spud in the May/June time
> frame.  The Company expects that the data gained during
> the drilling, evaluation and testing of the Tamandua #1
> well will be used to significantly help with future
> operations on the CPO 4 block.

> The Company also confirmed that the Securities and
> Exchange Commission ("SEC") is conducting a non-public
> formal investigation into the Company.  The Company's
> confirmation of such investigation follows receipt of
> information by the Company that third parties had become
> aware of the investigation.

Pursuant to the investigation, in February and April of 2012, the Company received three subpoenas issued by the SEC. The subpoenas called for the testimony of the Company's chief executive officer and chief financial officer and the delivery of certain documents. The subpoenas were issued pursuant to a nonpublic formal order of a private investigation issued by the SEC on March 1, 2011, which followed a nonpublic informal inquiry commenced by the SEC in October 2010. The Company received a copy of the nonpublic formal order of private investigation on February 10, 2010 in connection with the February 2012 subpoenas issued by the SEC. Although the Company cannot be certain of the scope of the investigation, the SEC is trying to determine whether there have been any violations of federal securities laws. The investigation does not represent a conclusion by the staff that there have been any violations of the federal securities laws nor whether the staff would conclude that any enforcement action is appropriate. At this time the Company has not been made aware of a finding by the SEC of any securities violations. Also, as stated in the subpoenas issued by the SEC, the investigation does not mean that the SEC has a negative opinion of any person, entity, or security. The Company has cooperated fully, and is committed to continuing to cooperate fully, with the SEC in this matter. It is not possible at this time to predict the timing or outcome of the SEC investigation, including whether or when any proceedings might be initiated, when these matters may be resolved or what, if any, penalties or other remedies may be imposed, and whether any such penalties or remedies would have a material adverse effect on the Company's consolidated financial position, results of operations, or cash flows.

That same day the price of Houston American's shares dropped $1.24, or more than 35.5% of its value, to close at $2.25 per share.

Since then the Company has admitted in its Form 10-Q, filed with the SEC for the period ending September 30, 2012, that the SEC investigation has targeted possible misrepresentations that the Company had made relating to the CPO-4 prospect, specifically "to matters relating to disclosures in the late 2009 and early 2010

time period regarding resource potential for the CPO-4 prospect."

As a result of Houston American's wrongful acts and omission and the precipitous drop in its stock value, Plaintiffs claim that class members have suffered significant losses and damages.

Plaintiffs assert two causes of action.  The first is against Houston American, Terwilliger, and Jacobs for violations of Section 10(b) and Rule 10b-5 of the Exchange Act.  The second is against the Individual Defendants for violations of Section 20(a) of the Exchange Act.

### Defendants' Motion to Dismiss (#53)

Characterizing the Amended Complaint as impermissibly premised on fraud by hindsight, Defendants insist that Houston American continually warned that there is no way to predict prior to drilling and testing whether a well will be successful.  In every press release about the Tamandua #1 well, Houston American expressly stated that "there is no assurance that we will locate hydrocarbons in sufficient quantities to be commercially viable." It repeatedly warned that preliminary hydrocarbon shows did not mean the well would be a success.

Defendants contend that the Amended Complaint fails to satisfy the heightened pleading requirements of the PSLRA in the following ways.  First, it fails to allege particularized facts showing that Houston American made false statements, but instead relies entirely on alleged statements by unnamed "Confidential Witnesses" to create

the impression that Houston American knew in 2011 that the well would not be commercially viable. *See Material Yard Workers Local 1175 Ben. Funds v. Men's Wearhouse, Inc.*, No. H-09-3265, 2011 WL 3059229, at *6 (S.D. Tex. July 22, 2011)(Hughes, J.)("A party who presents the stories of unnamed people is neither giving the court nor the defendant a plain statement of the facts. . . . A secret witness is not far above a false witness."),[16] *citing Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007)("[W]e must discount allegations that the complaint attributes to five 'confidential witnesses' . . . . It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences [as required by *Tellabs*].[17]   Perhaps these confidential sources have axes to

---

[16] In #54, Plaintiffs insist that Defendants' citation to *Men's Wearhouse* is inapposite and incorrectly states the findings of the court, which really found that "office gossip" from four confidential witnesses "with misplaced understanding of the facts at the time and their inability to anticipate the economy, consumer, and management," "people [who] disagreed with their superiors about the policy and strategy of Wearhouse executives," but who were not "privy to the big picture," were insufficient to support a fraud claim.  It does not hold that disagreements among business executives cannot form a basis for an inference of falsity.  2011 WL 3059229, at *6.  The Court agrees.

[17] This Court would point out that the Fifth Circuit has approvingly cited this passage in *Higginbotham* in *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008), but with key qualifications:

> That these allegations derive from confidential sources further detracts from their weight in the scienter analysis.   Following *Tellabs*, courts must discount allegations from confidential sources. *Higginbotham v.*

*Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007). Such sources afford no basis for drawing the plausible competing inferences required by *Tellabs*. *Id.* at 757 ("*Tellabs* requires judges to weigh the strength of plaintiffs' favored inference in comparison to other possible inferences in comparison to other possible inferences; anonymity frustrates that process."). At the very least, such sources must be described 'with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded. . . ." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002).

*See also Central Laborers' Pension Fund v. Integrated Elec. Serv., Inc.*, 497 F.3d 546, 552 (5th Cir. 2007)("Confidential source statements are a permissible basis on which to make an inference of scienter" (*citing ABC Arbitrage*, 291 F.3d at 353); such statements should provide "specific details, such as particular job descriptions, individual responsibilities, and specific employment dates for the witnesses" (*citing id.* at 354)).

Moreover, in *ABC Arbitrage*, *id.* at 353, the Fifth Circuit adopted the holding and multi-step analysis of the Second Circuit in *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir.), *cert. denied*, 531 U.S. 1012 (2000):

(1) [I]f plaintiffs rely on confidential personal sources *and* other facts, their sources need not be named in the complaint so long as the other facts, *i.e.*, documentary evidence, provide an adequate basis for believing the defendants' statements or omissions were false or misleading;

(2) if the other facts, *i.e.*, documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false, the complaint need not name the personal sources so long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief.

3. if the other facts, *i.e.*, documentary evidence do not provide an adequate basis for believing that the defendants' statements or omissions were false *and* the descriptions of the position occupied by the source would

possess the information pleaded to support the allegations of false or misleading statements made on information and belief, the complaint must name the personal sources.

The appellate court in *Tellabs(II)*, 513 F.3d at 712, concluded,

> The confidential sources listed . . . consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify. . . . The information that the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources. . . . the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions.

This Court finds that in the instant action the Amended Complaint, in identifying the Confidential Witness' expertise, positions, and times employed, satisfies the second prong here in pleading sufficiently "to support the probability that a person in the position occupied by the source . . . would possess the information pleaded. . . ." *ABC Arbitrage*, 291 F.3d at 353.

In response in opposition (#54 at p. 34), Plaintiffs note that the court in *Men's Wearhouse* found that the confidential witnesses' testimony was unreliable or the witnesses were not in a position to have knowledge about the facts to which they testified. *Men's Wearhouse*, 2011 WL 3059229 at *6. Furthermore in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.("Tellabs II")*, 513 F.3d 702, 711-12 (7th Cir. 2008), the Seventh Circuit distinguished *Higginbotham*, the case relied on in both *Men's Wearhouse* and *Indiana Elec. Workers'*, stating about *Higginbotham*, in which the Confidential Witnesses' statements were steeply discounted,

> But that was a very different case from this one. . . . There was no basis other than the confidential sources, described merely as three ex-employees of Baxter and two consultants, for a strong inference that the subsidiary had failed to conceal the fraud from its parent and thus the management of the parent has been aware of the fraud during the period covered by the complaint.
> The confidential sources listed in the complaint in this case, in contrast, are numerous and consist of persons who from the description of their jobs were in a position to know firsthand the facts to which they are

grind.  Perhaps they are lying.  Perhaps they don't even exist."). Furthermore Defendants argue that the allegations are "ambiguous as to timing and blur the lines between the witnesses' knowledge of the post-testing state of play in 2012 and what Defendants knew in 'real time' during 2011," despite the fact that the PSLRA requires particularized statements showing that the 2011 statements were false when made.

Second, Defendants contend that the Amended Complaint fails to plead particularized facts raising a strong inference of scienter.  Although Plaintiffs assert that Defendants made false statements to inflate the value of Houston American's stock, the only sales of such stock by Defendants occurred after the well failed and after Houston American's share price declined.  Moreover the Amended Complaint indicates that at its own risk, Houston American paid $5 million for a second test of the well, demonstrating that it did not know there was "no oil" in the well.

Third, Defendants complain that the Amended Complaint attempts to extend the class period back to challenge the reserve estimate in the November 2009 investor presentation.  Defendants object that

_____

       prepared to testify. . . . The information the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources.

*See In re TETRA Technologies, Inc. Sec. Litig.*, Civ. A. No. 4:08-cv-0965, 2009 WL 6325540, at *6-7 (S.D. Tex. July 9, 2009)(Ellison, J.)(discussing and using approach in *Tellabs II* and *ABC Arbitrage*).

the claim is barred by (1) the PSLRA's safe harbor for forward-looking statements and (2) the applicable two-year statute of limitations.  They also charge that the allegations fail to satisfy the PSLRA's heightened pleading standard.

Defendants emphasize that with each press release and disclosure, Houston American stated that there was no certainty that Houston American would locate commercially viable hydrocarbons in the Tamandua well.  They also advised potential investors to carefully review the filings with the SEC, quoting examples in which they identify many risk factors that affect their business plan.

Plaintiffs claim that Houston American's statements that the Tamandua well encountered shows of hydrocarbons during drilling were false at the time they were made.  Defendants respond that they were not false for several reasons.  First, Houston American never stated that there was commercially viable oil or gas in the Tamandua well and, citing examples, it repeatedly warned that regardless of any hydrocarbons observed during drilling, it would not know the results until the well was tested and there might not be commercially viable hydrocarbons in the well.  Second, they maintain that the market understood that Houston American's statements were not promises or predictions; from the beginning, in its first disclosure on October 5, 2011, it disclosed that the "strong inflow of hydrocarbons forced the well to be shut-in and

stabilized" and "compromised the mud system."  The drop in the value of its stock that day reflects that understanding of the serious problems encountered in the drilling.  Third, significantly none of Plaintiffs' Confidential Witnesses disputes that the well had to be "shut-in" due to a "strong inflow of hydrocarbons." Confidential Witness 3 is the *only witness who worked at SK in 2011* while the well was being drilled and thus the only one with personal knowledge of what was happening and what was known by Houston American at the time; he acknowledges that there were hydrocarbon shows during the drilling phase and questions only whether they were "strong."  There also is no allegation that he made this belief known to Houston American.  Moreover the Amended Complaint states that Confidential Witness 3 "had many disagreements with Houston American" and "different opinions."  #44 at ¶ 57.[18]  Disagreements among business executives, by themselves, do not support an inference of falsity.  Confidential Witness 5 appears to concede that there were at least some hydrocarbons in the well in stating that there "was nothing commercially viable" and "no continuous flow."  Confidential Witness 4's statement suggested the same:  "I never got the impression from my review of the geological tests and records that there were significant hydrocarbons discovered along the way."  Houston American,

---

[18] This Court observes that the substance of this sentence appears inconsistent with that in the one before it.

moreover, had warned that "it is not easy to verify the quantity and quality of hydrocarbons in the formations due to the lack of porosity data" in the well.

Defendants also argue that since Plaintiffs are not able to provide particularized allegations that the hydrocarbon shows in 2011 were nonexistent, they instead attempt to make a fraud-by-hindsight case by taking allegations about the final 2012 test results and implying that Defendants knew about the underlying facts in 2011. Plaintiffs' allegations about the timing of the final testing are also not particularized. They state that the final testing of the bottom of the well occurred in February or March of 2012. On March 2, 2012 Houston American disclosed that it decided to abandon testing of the lower portion of the well and plug back the well while continuing to evaluate the higher-level C-7 and C-9 formations. The Confidential Witnesses do not appear to dispute that Houston American continued to evaluate the C-7 and C-9 formations nor disagree with its statement on August 19, 2012 that it was ceasing efforts to test and complete the C-7 and C-9 formations because of formation damage during drilling. Thus again the Confidential Witnesses do not contradict Houston American's disclosures.

In sum Defendants insist that the Amended Complaint does not plead facts showing that Houston American's statements, which were mainly comprised of disclosures of the current depth of the

drilling in the well, problems encountered in the drilling, and warnings that the well might not yield commercially viable hydrocarbons, were false. Plaintiffs try to conflate the state of knowledge after the 2012 testing with the real-time knowledge in 2011 and fail to demonstrate with particularity that Houston American made material misstatements. *See Stockman v. Flotek Indus., Inc.*, No. H-09-2526. 2010 WL 3785586, at *15- 23 (S.D. Tex. Sept. 29, 2010)(rejecting allegations from "confidential witnesses" that were not sufficiently particularized or reliable).

To Plaintiffs' contention that Houston American should have disclosed the SEC investigation sooner, e.g., in its 2011 Form 10-K, Defendants respond that it fails as a matter of law. An SEC investigation is not a pending legal proceeding or litigation and an issuer has no duty to disclose such an investigation "until it reaches a stage when the agency or prosecutorial authority makes known it is contemplating filing suit or bringing charges." *Richman v. Goldman Sachs Grp.*, 868 F. Supp. 2d 261, 272 (S.D.N.Y. 2012),[19] *citing* David M. Stuart and David A. Wilson, *Disclosure*

---

[19] The Court agrees that technically Defendants are correct. In *Richman* the court explained that the SEC notifies a company that it is contemplating recommending to the Commission that suit be filed or charges be brought by issuing it a "Wells Notice," "but that is well short of litigation." *Id.* at 272. *See generally In re Initial Public Offering Sec. Litig.*, No. 21 MC 92 (SAS), 2004 WL 60290 (S.D.N.Y. Jan. 12, 2004). Before the SEC issues a Wells Notice, an investigation by it does not mean that the SEC has concluded that there are any violations of federal securities laws or that an enforcement action is appropriate; indeed the SEC subpoenas clearly state that "the investigation does not mean that

*Obligations Under the Federal Securities Laws in Government Investigations*, 64 Business Lawyer 973 (Aug. 2009).  Houston American's statement that it faced no pending or threatened litigation therefore was not false.  *Id.* at 272-74.

Defendants further object that Plaintiffs' allegations do not give rise to a strong inference of scienter as to Terwilliger or Jacobs, the only individual Defendants accused of primary §10(b)/Rule 10b-5 violations, and thus the claims against them individually as well as against Houston American should be dismissed.  "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'--it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.

Insisting there are no particularized facts showing that any

_____

the SEC has a negative opinion of any person, entity or security."  Plaintiffs in this case do not dispute that the investigation never reached the Wells Notice stage.  Thus to describe the investigation as "threatened" litigation in the absence of a Wells Notice would be misleading.  *Richman*, 868 F. Supp. 2d at 272 ("The SEC provides a target of an investigation with a Wells Notice 'whenever the Enforcement Division staff decides, even preliminarily, to recommend charges.'")(*quoting Initial Public Offering*,2004 WL 60290, at *1).  Nevertheless the fact that Defendants delayed reporting it to the public and when they did, did not fully disclose the facts they knew about it can be one factor to evaluate in determining whether Plaintiffs have stated a viable claim under the Exchange Act.

Defendant knew that any statements were false, Defendants contend that Plaintiffs fail to identify any specific communications or reports to Terwilliger or Jacobs that directly contradict their public statements or identify the information that was furnished and when it was furnished. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002)(dismissing complaint where plaintiffs "point[ed] to no specific internal or external report available [to Defendants] at the time of the alleged misstatements that would contradict them"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cor. 2003)(dismissing complaint where report "fail[ed] to identify exactly who supplied the information [that contradicted company's public disclosures] or when [management] knew the information"); *In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 890 (N.D. Tex. 2005)("The Complaint does not allege the existence of any specific reports that would have disclosed such irregularities that were provided to the Individual Defendants.").

Moreover Defendants also assert that Plaintiffs' reliance on confidential sources and their inability to plead falsity with particularity work against an inference of scienter. Defendants urge that statements by sources who were not employed at SK or Houston American at the time of the making of the alleged misstatements "could hardly be probative of the individual Defendants' scienter concerning matters that happened when they

-51-

were not employed" there.   *In re Dell Inc.*, 591 F. Supp. 2d 877, 895 (W.D. Tex. 2008).

Pursuant to *Tellabs*, Defendants maintain that the allegations in the governing complaint support an overwhelming competing inference that Terwilliger and Jacobs did not act fraudulently. There are no allegations of insider trading or personal profit from the alleged misrepresentations.   *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253 (11th Cir. 2008)(lack of suspicious stock sales or other financial motive "weighs against inferring scienter").[20] Terwilliger only sold stock on April 24, 2012, after Houston American's stock price had declined.   Moreover the complaint alleges that he sold not by choice, but because his bank made him sell to cover a margin call.   There are no allegations that Jacobs sold any stock.

Defendants point to alleged facts that undermine any inference of fraudulent intent: (1) after SK decided to abandon the Tamandua #1 well, Houston American chose to do a second test on the well at its own expense; (2) Houston American paid about $5 million for the

---

[20] The Court notes that in *Tellabs*, 551 U.S. at 325, Justice Ginsburg wrote for the majority of the Supreme Court, "While it is true that motive can be a relevant consideration and personal financial gain may weigh heavily in favor of a scienter inference, . . . the absence of a motive allegation is not fatal. . . . [A]llegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint."   Thus Defendants' argument that they had no motive of personal gain by itself is not persuasive.

second test of the C7 formation but would not have done so if it had known all along that the well would be unsuccessful; (3) Houston American and its partners spent $50 million drilling the Tamandua well, suggesting that they were committed to and believed in the opportunity; (4) SK was purportedly less enthusiastic but continued to participate and wanted to drill at least two wells; (5) Plaintiffs fail to refute Houston American's October 5, 2011 statement that the well had to be shut-in due to a "strong inflow of hydrocarbons" that "compromised the mud system," an event that substantiates Houston American's disclosures about hydrocarbon shows while also providing a plausible explanation why the company experienced difficulty continuing with the well; and (6) Houston American made candid disclosures regarding technical difficulties and delays encountered while drilling the Tamandua well and repeatedly advised its shareholders that there could be no assurance of locating hydrocarbons in commercially viable quantities.  The facts weigh heavily against an inference of scienter and show the opposite--that Houston American spent millions of dollars and considerable time and effort drilling the well and trying to find oil.  Defendants made clear that Houston American was a high risk investment  and repeatedly warned that the presence of hydrocarbon shows does not guarantee a positive result.

Defendants argue that the new claim about the November 2009 estimate, made prior to drilling any wells on CPO 4, is barred by

the safe harbor for forward-looking statements because it was accompanied by meaningful cautionary language[21] and Plaintiffs fail to show that it was made with actual knowledge of its falsity and therefore applies regardless of whether the cautionary language is deemed sufficient.  15 U.S.C. § 78u-5(c); 15 U.S.C. § 77z-2 (defining forward-looking statement broadly and expressly including a "statement of future economic performance").  *See also Arkoma Basin Exploration v. FMF Assocs. 1990-A, Ltd.*, 249 S.W. 3d 380, 385

---

[21] See #53, Ex. I (first slide in the presentations entitled "Forward Looking Statements"), stating in part,

> This presentation contains forward-looking statements, including those relating to our future financial and operational results, reserves or transactions, that are subject to various risks and uncertainties that could cause the Company's future plans, objectives and performance to differ materially from those in the forward-looking statements.  Forward-looking statements can be identified by the use of forward-looking terminology such as "may," "expect," "intend," "plan," "subject to," "anticipate," "continue," "present value," "future,", "reserves," "appears," "prospective," or other variations thereof or comparable terminology.  Factors that could cause or contribute to such differences could include, but are not limited to, those relating to the results of exploratory drilling activity, the Company's growth strategy, changes in oil and natural gas prices, operating risks, availability of drilling equipment, availability of capital, weaknesses in the Company's internal controls, the inherent variability in early production tests, dependence on weather conditions, seasonality, expansion and other activities of competitors, changes in federal or state environmental laws and administration of such laws, the general conditions of the economy and its effect on the securities market, the availability, terms or completion of any strategic alternative or any transaction and other factors described in "Risk Factors" and elsewhere in the Company's Form 10-K and other filings with the SEC.

(Tex. 2008[22])(oil and gas reserve estimates for fields with little drilling or production are statements of opinion regarding what can be produced in the future and "reserve estimates inherently include analysis and assumptions about future events").  Risk disclosures in prior SEC filings may be "incorporated by reference into a forward looking statement," as Houston American did, and Houston American's annual report filed with the SEC included nine pages of detailed and specific cautionary language (Ex. C (#53-4) at pp. 15-25).[23]

Regardless, insist Defendants, Plaintiffs' new claim is time-barred because it was not commenced within "the earlier of--(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. § 1658(b).  "[T]he limitations period [for a § 10(b) claim] begins to run once the plaintiff did discover or a reasonably diligent plaintiff would

---

[22] Plaintiffs point out that *Arkoma* applied Virginia law and is inapposite.  They claim they have adequately alleged that Defendants actually knew their statements were false when made, *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d at 228, 244 (5th Cir. 2009)(Even if a statement is forward-looking and accompanied by cautionary language, it is still actionable if made with actual knowledge of its falsity), which post-dates *Southland*, 365 F.3d 353.

[23] Nevertheless, a review of the risk factors listed in Houston American's SEC filing (Ex. C (#53-4) at pp. 15-25) reveals that they are general to the industry, indeed closer to boilerplate, but not company-specific or project-specific (well-specific). Moreover a defendant's actual knowledge of the falsity of his statement will defeat the safe harbor defense.  *Lormand*, 565 F.3d at 244; *Southland*, 365 F.3d at 371.

-55-

have 'discover[ed] the facts constituting the violation'--whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 130 S. Ct. 1784, 1798 (2010).  The statement was made on November 9, 2009, more than three years before Plaintiffs first asserted this claim, and Plaintiffs have alleged that "the facts constituting the violation were known more than two years before Plaintiffs asserted this claim." Plaintiffs allege that the November 2009 estimate was false because it does not meet the PRMS definition of "reserves." Houston American's Form 10-K filed on March 29, 2010 disclosed approximately 1.2 million barrels of proved developed and proved undeveloped reserves in Colombia. Ex. K.  If they believed that the November 2009 estimate of one to four billion barrels referred to PRMS' definition of "reserves," Plaintiffs would clearly have discovered the truth by March 29, 2010, which is more than two years before they brought this claim.  Furthermore, even news articles referenced in the Amended Complaint that purportedly revealed the truth and questioned the veracity of the November 2009 estimate came more than two years before they brought this claim.

Next, Defendants move to dismiss because Plaintiffs have failed to plead loss causation, i.e., facts showing "that the market reacted negatively to a corrective disclosure, which revealed the falsity of [the company's] previous representations." *Catogas v. Cyberonics, Inc.*, 292 Fed. Appx. 311, 314-15 (5th Cir, 2008), *citing Dura Pharm.*, 544 U.S. at 342.  The "truth" revealed

in a corrective disclosure must "'make the existence of the actionable fraud more probable than it would be without the alleged fact (taken as true).'" *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.,* 597 F.3d 330, 337 (5ᵗʰ Cir. 2010), *rev'd on other grounds, Erica P. John Fund*, 131 S. Ct. 2179.  "[T]he truth revealed by the corrective disclosure must show that the defendant more likely than not misled or deceived the market," as "[o]therwise, the misstatements would do little more that 'touch upon' the alleged loss rather than cause the loss."  That Houston American failed to find commercially viable amounts of hydrocarbons in the well does not "make the existence of the actionable fraud," i.e., the prior representations about preliminary hydrocarbon shows, "more probable than it would be without the alleged fact (taken as true)."  Houston American warned from the start that the presence of hydrocarbon shows did not mean that commercially viable amounts of hydrocarbons would be found.  Thus the ultimate failure to find such is not "corrective" of the earlier statements and does not "show that [Houston American] more likely than not misled the market" about the shows.  Thus Plaintiffs have not pleaded loss causation.

Similarly the 1-4 billion estimated reserves claim also fails for lack of loss causation.  If the 1-4 billion were construed as a representation about commercially viable and producible reserves supported by actual production or formation tests, Houston

American's subsequent Form 10-K disclosure that it had only 1.2 million barrels of reserves in Colombia corrected the disclosure. There is no allegation that this corrective disclosure produced any loss.

Last of all, Defendants claim that the Amended Complaint fails to plead a § 20(a) control person claim. "Where a primary violation by the 'controlled person' has not been adequately pleaded, the court should also dismiss a section 20(a) claim." *In re Capstead Mortgage corp. Sec. Litig.*, 258 F. Supp. 2d 533, 548 (N.D. Tex. 2003).

### Lead Plaintiffs' Memorandum of Law in Opposition (#54)

After reiterating the many allegations of their Amended Complaint, Lead Plaintiffs remark that rather than disputing the falsity of the statements they challenge, Defendants focus on discrediting the testimony of the Confidential Witnesses, specifically that Plaintiffs have taken allegations about the final 2012 test results and implied that Defendants knew these facts in 2011. Although Confidential Witness 4 did not join SK until January 2012, he did review the geological tests and records from the initial drilling records and said that he did not find evidence of strong hydrocarbons at any time. #54 at p. 16, referencing #44, ¶ 68. Contrary to Defendants' assertions, Plaintiffs do not allege that Defendants' materially false or misleading statements ended in 2011: Confidential Witness 5 testified about the disappointing C9

results relating to Defendants' false or misleading statements after February 2012. *Id., citing id.* at ¶¶ 99, 103.

Plaintiffs deem "unpersuasive" Defendants' argument that statements that hydrocarbon shows were strong or significant are issues of opinion that do not support an inference of falsity. Plaintiffs insist that, first, a statement of opinion can be materially false and/or misleading for purposes of security fraud claims if the statement is made without a basis in fact. *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093-94 (1991)(opining that conclusory statements such as that the proposed merger's terms were "fair" and the consideration price "high" are actionable under the federal securities laws because "conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading"); *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994)(predictions regarding potential productive capacity of oil well did not have a reasonable basis where unsupported by test results; "predictive statements are deemed to contain false statements of 'fact' under Rule 10b-5 when the predictions embodied in those statements do not have a reasonable basis.")[24]; *Krim v.*

---

[24] The Court notes that in *Rubinstein*, 20 F.3d at 166, the Fifth Circuit quoted from *Isquith v. Middle South Utilities*, 847 F.2d 186, 203-04 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988):

  "[W]hen necessary, courts have readily conceded that predictions may be regarded as 'facts' within the meaning of the antifraud provisions of the securities laws. . .

*BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)("[A]n affirmative statement by an issuer must have some basis in fact" for any opinion evaluating investment in the company).  What Defendants call "opinions" were based on specific data, test results, and reports, which contained known information with industry standards that guide interpretations of the information. #54 at p. 11, citing #44, ¶¶ 95-96, 104, and Federman Decl. at Ex. A.  Confidential Witnesses 3 and 4, both members of the technical committee who reviewed the same reports and data as Houston American, unequivocally stated that there were never any findings of "strong shows of hydrocarbons."  #44, ¶¶ 95-96, 103-04.

Plaintiffs further assert that even if Defendants' statements about "significant" or "strong" hydrocarbon shows and oil shows could somehow be construed as not false, they were materially

_____

. Most often, whether liability is imposed depends on whether the predictive statement was 'false' when made. The answer to this inquiry, however, does not turn on whether the prediction in fact proved to be wrong; instead, falsity is determined by examining the nature of the prediction--with emphasis on whether the prediction suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis."

The Fifth Circuit then commented, *id.*,

In sum, a predictive statement is one that contains at least three factual assertions that may be actionable: 1) the speaker genuinely believes the statement is accurate; 2) there is a reasonable basis for that belief; and 3) the speaker is unaware of any undisclosed facts that would tend seriously to undermine the accuracy of the statement.

misleading because there was a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc.*, 485 U.S. at 231-32. "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009).

Plaintiffs also argue that Defendants' statements of optimism[25] were also materially false or misleading. There were no "strong shows of hydrocarbons" to justify encouragement. By March 16, 2012, the test of the C9 formation was completed, Defendants knew about the disappointing results (¶¶ 63, 67, 99), and SK had decided not to participate in or to fund testing of the adjoining C7 formation (¶¶ 64, 69), none of which was disclosed to investors. Thus Defendants' statements on March 1, 2012 ("the well exhibited oil shows while drilling, and other indications of hydrocarbons such as log analysis that indicate possible productive sands"), on March 7, 2012 (same), on March 16, 2012 ("We remain optimistic about our CPO 4 prospect"), and on April 4, 2012 ("Although there have been delays with the testing, the Company remains optimistic

---

[25] For example, "we are very encouraged from the strong shows of hydrocarbons" (¶ 90); describing the shows and prospects for the well as "very, very positive"(¶ 92); "we are very encouraged by the response of the C7 and C9 sands bound in the well: (¶ 94); and "[w]e remain optimistic about our CPO 4 prospect" (¶ 109).

that these conditions will be overcome and that it will be able to establish a successful test on the Tamandua #1 well.") were materially false or misleading.  When Defendants chose to speak about the progress and results of the partners' exploration of the Tamandua #1 well, they had a duty to do so truthfully, accurately, and in a way that would not mislead investors.  *In re Enron Corp. Sec., Derivative, and "ERISA" Litig.*, 258 F. Supp. 2d 576, 590 (S.D. Tex. 2003)(when a "corporation makes a disclosure of material fact, voluntarily or involuntarily, the courts have recognized that 'there is a duty to make it complete and accurate.'"); *Lormand*, 565 F.3d at 249 ("Once the defendants engaged in public discussion concerning the benefits of Type I affiliation and the no-deposit programs, they had a duty to disclose a 'mix of information' that is not misleading"); *Rubinstein*, 20 F.3d at 170 ("[U]nder Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes to say anything.").  Plaintiffs further claim that the statements identified by Defendants as cautionary statements are inapposite because they only caution about the quantity ("there is no assurance that we will locate hydrocarbons in sufficient quantities to be commercially viable") of recoverable hydrocarbons, but not the quality.  Defendants' repeatedly positive description of the hydrocarbon shows and the progress in the Tamandua well were materially false or misleading because they led investors to believe that Houston American had found hydrocarbons of a

-62-

commercially viable quality, i.e., a quality that could potentially be producible by conventional petroleum production techniques), when actually that had not been determined.  Defendants did not disclose the real risk that the hydrocarbons might not be producible at all by economically viable means, as proved to be true.  The cautionary warnings did not put investors on notice that Houston American's statements that it had found oil were false.

Plaintiffs insist that Defendants' November 9, 2009 statement of "recoverable oil reserves" is not shielded by the safe harbor provision for several reasons.  First, the statement about the estimate of 1-4 billion barrels of recoverable reserves is not forward-looking, but a statement of existing fact because Defendants represented that they had a basis for making that estimate.  Industry standards require a minimum amount of testing and analysis before a company can classify oil estimates as "reserves."  Their statement implies that they had conducted the necessary testing when they had not.  Even if it could be interpreted as forward-looking, the safe harbor would not apply because the statement was not accompanied by any meaningful cautionary statements that would trigger such protection.  *Lormand*, 565 F.3d at 244-45 (requiring "'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances").  It is well settled that boilerplate risk warnings such as those Defendants seek to hide

behind will not shield defendants who in fact knew full well of the adverse facts belying their public representations. Risk disclosures containing generalized warnings about industry conditions that may affect the company's business and financial results, "such as that the mineral exploration business is inherently risky, need not be disclosed as such information is already included in the 'total mix of information.'" *Rubinstein*, 20 F.3d at 168 n.30 (noting that alleged misrepresentations and cautionary language must be analyzed in context and the presence of cautionary language is not *per se* dispositive), *citing Krim*, 989 F.2d at 1446 (observing that securities laws require issuers to disclose material, firm-specific information regarding predictions--not information concerning general economic "facts" and conditions already known to investors and analysts). Furthermore, the adequacy of risk warnings is a factual issue not to be resolved on the pleadings. *Lormand*, 565 F.3d at 248 ("Because 'reasonable minds could . . . disagree as to whether the mix of information in the document is misleading,' the statutory safe harbor provision cannot provide the basis for dismissal as a matter of law."); *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 369 (5th Cir. 2001)("Whatever the ultimate answer to the adequacy of the disclosures under the [Securities] Act, we are not persuaded that the decision ought to be made here in ruling on a motion to dismiss."). The Court agrees.

Plaintiffs also object to Defendants' contention that the November 9, 2009 misrepresentation regarding the oil reserve estimate fails because it is time-barred under 28 U.S.C. § 1658(b),[26] which provides that a securities fraud claim must be brought no later than the earlier of two years after discovery of the facts constituting the violation or five years after such violation.   They argue that the statute of limitations is an affirmative defense and should not be considered by the Court on a motion to dismiss.[27]   Plaintiffs further contend that in *Merck &*

---

[26] Section 1658, effective July 30, 2002, provides,

(a) Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

(b) Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47), may be brought not later than the earlier of--

    (1) 2 years after the discovery of facts constituting the violation; or

    (2) 5 years after such violation.

[27] The Court finds that Plaintiffs' statement needs to be modified.   The law actually is that affirmative defenses are not appropriate grounds on which to dismiss a claim under a Rule 12(b)(6) motion *unless the facts giving rise to an affirmative defense appear* "*clearly on the face of the pleadings.*"   *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982)("[A] complaint that shows relief to be barred by an affirmative defense, such as statute of limitations, may be dismissed for failure to state a cause of action."), *cert.*

*Co., Inc. v. Merck*, 559 U.S. 633 (2010), the Supreme Court held

that the statute of limitations for securities plaintiffs only

begins to run once plaintiffs are on notice of the facts

constituting each element of the alleged § [10(b)] violation.[28]

_____

*denied*, 459 U.S. 1105 (1983); *Clark v. Amoco Prod., Inc.*, 794 F.2d
967, 970 (5th Cir. 1986)(a court should grant dismissal under Rule
12(b)(6) "if a successful affirmative defense appears clearly on
the fact of the pleadings")(citations omitted); *Harris v. Rivera*,
Civ. A. No. 3:11-CV-3013-D, 2013 WL 246709, at *5 (N.D. Tex. Jan.
13, 2013)(same). Even if plaintiff fails to plead the elements of
an affirmative defense, judgment on the pleadings under Rule 12(c)
is appropriate if judicially noticeable facts and materials, in
conjunction with the plaintiff's pleadings, establish a successful
affirmative defense. *Herbert Abstract Co. v. Touchstone Props.,
Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990).

    [28] The Court finds that Plaintiffs' description of the Supreme
Court's ruling in *Merck* is not accurate. The Supreme Court held
the statute of limitations for a private right of action for
securities fraud begins to run when the plaintiff actually
discovers facts constituting the violation or when *a reasonably
diligent plaintiff would have discovered facts constituting the
violation*, whichever comes first. 559 U.S. at 1798. It further
ruled that scienter is such a "fact constituting the violation"
under the language of § 1658(b) and thus must be discovered (or
discoverable by a reasonably diligent plaintiff) before limitations
begins to run. *Id.* at 1796.
    In addition the high court made clear that the term "inquiry
notice," frequently used by courts to identify the time when the
plaintiff has sufficient information to cause a reasonably diligent
plaintiff to begin investigating if his rights have been infringed
by possible wrongdoing, is not consistent with the language of
the 28 U.S.C. § 1658(b)(1), which states that a plaintiff's claim
accrues only after the "discovery" of the facts constituting the
violation. 559 U.S. at 1797. "Nothing in the text suggests that
the limitations period can sometimes begin *before* 'discovery' can
take place." *Id.*
    The Supreme Court summarized its holding, 130 S. Ct. at 1798,
thus:

        We conclude that the limitations period in § 1658(b)(1)
        begins to run once the plaintiff did discover or a
        reasonably diligent plaintiff would have "discover[ed]

-66-

Plaintiffs maintain that since scienter is one element of a §
10(b)/Rule 10b-5 claim, before limitations could begin to run
plaintiffs had to be on notice of specific facts evidencing
Defendants' scienter of the alleged misstatements.   They cite *City
of Pontiac General Employees' Retirement System v. MBIA, Inc.*, 637
F.3d 169, 175 (2d Cir. 2011)(holding that under *Merck,* "a fact is
not deemed 'discovered' until a reasonably diligent plaintiff would
have sufficient information about that fact to adequately plead it
in a complaint," i.e., "until he can plead that fact with
sufficient detail and particularity to survive a 12(b)(6) motion to
dismiss.").[29]   The Second Circuit remanded the suit to the district

---

> the facts constituting the violation"--whichever comes
> first.   In determining the time when "discovery" of those
> "facts" occurred, terms such as "inquiry notice" and
> "storm warnings" may be useful to the extent that they
> identify a time when the facts would have prompted a
> reasonably diligent plaintiff to begin investigating.
> But the limitations period does not begin to run until
> the plaintiff thereafter discovers or a reasonably
> diligent plaintiff would have discovered "the facts
> constituting the violation," including scienter-
> irrespective of whether the actual plaintiff undertook a
> reasonably diligent investigation.

[29] In the only Fifth Circuit case to address the *Merck* and *City
of Pontiac*'s holdings, *North Port Firefighters' Pension-Local
Option Plan v. Temple-Inland, Inc.*, ___ F. Supp. 2d ___, 2013 WL
1263161, at *29-30 (N.D. Tex. Mar. 28, 2013), the Northern District
of Texas observed that in the case before it the parties disagreed
whether the plaintiffs should have discovered the alleged scheme
earlier and determined that "the issue of whether the statute of
limitations has run on Plaintiffs' claims is a factual dispute not
appropriate for resolution at this time on Defendants' motion to
dismiss."   The district court, denying the motions to dismiss,
further observed that in *Merck*, the Supreme Court

court, *inter alia*, in light of *Merck*'s ruling on the statute of limitations to determine whether, in light of the defendant's inquiry notice defense the plaintiffs had sufficient information about the defendant's scienter to plead their claims.

Plaintiffs claim that they did not have access to facts supporting Defendants' scienter regarding the November 9, 2009 misrepresentation about the CPO 4 oil reserve estimate until at least April 19, 2012, when Houston American disclosed that it was being investigated by the SEC. #44, ¶¶ 88, 106, 112. Plaintiffs did not learn until November 9, 2012 that the SEC was focused on Defendants' disclosures about the oil potential in CPO 4. #44, ¶¶ 13, 112. They also maintain that only during Plaintiffs' investigation to prepare their Amended Complaint, filed on November

---

rejected an "inquiry notice" interpretation of 28 U.S.C. § 1658(b)(1), explaining that "the point where the facts would lead a reasonably diligent plaintiff to investigate further . . . is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other 'facts constituting the violation.'" 130 S. Ct. at 1797. Thus, even assuming that any of the events cited by Defendants put Plaintiffs on inquiry notice, which would then spur or should have spurred Plaintiffs to investigate further, such assumption does not allow the Court to determine, based on the pleadings and the related attachments, when exactly Plaintiffs should have discovered the facts constituting the violation. Simply put, the Court cannot say that as a matter of law, the Plaintiffs did discover, or a reasonably diligent plaintiff would have discovered, the facts constituting scienter, more than two years prior to the filing of the complaint . . . .

The Court find that in this case, the limitations issue cannot be decided on a motion to dismiss.

15, 2012, did Confidential Witness 1 inform them that Houston American did not conduct any tests necessary to estimate the amount of recoverable reserves and therefore lacked a reasonable basis to claim that they had discovered reserves. Although Defendants argue that limitations began to run no later than June 28, 2010 when the *Sharesleuth.com* articles published on the internet questioned the veracity of Defendants' "audacious" claims of 1-4 billion barrels of potential reserves, it failed to cite any tangible evidence that Defendants were intentionally misleading investors. #44, ¶¶ 79-81. In addition Defendants continued to falsely reassure investors about its growing reserves and production. *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 850 (S.D. Tex. 2004)("Investors are not placed on inquiry notice when 'the warning signs are accompanied by reliable words of comfort from management" "if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern."), *quoting LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003).[30]

---

[30] The district court went on to further quote the Second Circuit, *id. citing id.*,

> [w]hether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated . . . depend[s] in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence.

The judge concluded that the determination whether plaintiffs

Plaintiffs insist that the extension of the Class Period does not require republication of lead plaintiff notices.  Not only do Defendants fail to show why the current Lead Plaintiffs cannot adequately represent investors covered by the expanded Class period, but Defendants have no chance to be appointed Lead Plaintiffs because current Lead Plaintiffs have suffered far more substantial losses, more than $1.5 million.  Decl. of Federman, Ex. A and B in support of Spitzberg/Gerber Group's motion for consolidation, appointment of Lead Plaintiffs, and approval of Lead Plaintiffs' selection of co-lead counsel (#20).  The cost of republication would outweigh any marginal gains from notifying class members of the extension of the Class Period.  *Cyberonics*, 468 F. Supp. 2d at 938, *citing Greenberg v. Bear Stearns & Co.*, 80 F. Supp. 2d 65 (E.D.N.Y. 2000)(holding that the PSLRA "does not mandate, nor does it suggest, that a Court approved lead plaintiff must re-publish a notice of the purported class after an amended complaint is filed. . . . In cases where amended complaints encompassed the same claims and securities, but different class periods, courts have generally found that 'the efficiency of republication outweighs the marginal fairness gains of notifying class members of an extended class period.")(and cases cited therein).

_____

should not have relied on Dynegy's words of comfort could not be made on a motion to dismiss.

Plaintiffs also assert that they have adequately alleged a claim based on Defendants' failure to disclose the SEC investigation, which was clearly a "threatened" proceeding.  They argue that since Defendants stated in their 2010 Form 10-K and 2011 Form 10-K that they are "not aware of any current, pending, or threatened litigation or proceedings that could have a material adverse effect on our results of operations, cash flows or financial conditions," Defendants had a duty to complete that disclosure.  *Lormand*, 565 F.3d at 249 ("[W]e have long held under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything.").  The SEC's investigation related to Houston American's core operations--oil reserves and drilling--a matter that was indisputably material to investors in deciding whether to buy its stock.

Regarding allegations of scienter as to Terwilliger and Jacobs, Plaintiffs cite *Lormand*, 565 F.3d at 254, for the proposition that where a plaintiff demonstrates that an inference of scienter is at least "equally as compelling as any alternative inference," the "tie favors the plaintiff."  *See also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008)("Where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff.").  Plaintiffs maintain that the Amended Complaint contains numerous allegations that Terwilliger and Jacobs knew or recklessly disregarded the

alleged fraud based on their knowledge of and access to contrary information.   Such evidence is provided in the statements of Confidential Witnesses who worked side by side with Defendants on the Tamandua well project and who directly contradict Defendants' public statements.   Moreover Defendants fail to refute any of the Confidential Witnesses' statements about the November 9, 2009 reserves statements.   As noted, Jacobs signed the Form 8-K that included the allegedly materially false and/or misleading reserves estimate.   To demonstrate that Terwilliger and Jacobs had scienter, the complaint adequately asserts that the drilling partners had a management committee and a technical committee that regularly met to discuss efforts at Tamandua (#44, ¶¶ 40-41, 66), and that Terwilliger and Jacobs sat on both committees along with Confidential Witnesses 3 and 4 from SK.   Both Confidential Witnesses stated that the drilling never produced any evidence of strong hydrocarbon shows.   Confidential Witness 3 stated that even before drilling began, SK had low expectations for CPO 4 and that after seeing the seismic data, SK wanted to drill only two wells. The daily reports sent to Houston American detailing "everything that happened at the well" and the information conveyed to Defendants during the committee meetings contradicted representations made by Defendants publicly.   Furthermore, Confidential Witnesses 3, 4, and 5 all testified that the tests on the drilling operations to determine whether there were any

hydrocarbons found nothing.

Plaintiffs further point out that Houston American is a tiny company with only three employees (two being Terwilliger and Jacobs) and its only source of revenue is oil exploration, adding to a strong inference of scienter. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 425 (5th Cir. 2001)(in a small company making a single product, finding scienter adequately alleged for statements about patent protection for that product that was "obviously important," involved substantial company efforts, and about which the CEO had "ample opportunity to become familiar"); *In re Triton Energy Ltd. Sec. Litig.*, No. 5:98-CIV-256, 2001 WL 872019 (E.D. March 30, 2001)(finding inference of scienter where fraud involved company's most important assets).

Plaintiffs contend that their Confidential Witnesses satisfy the test of *ABC Arbitrage*, 291 F.3d at 352, and *Central Laborers*, 497 F.3d at 552, in that they are identified with "sufficient particularity to support the probability that a person in a position occupied by the source would possess the information alleged." "Confidential source statements are a permissible basis on which to make an inference of scienter." *Central Laborers*, 497 F.3d at 55. Plaintiffs have alleged each Confidential Witness's job title and responsibilities, period of employment, and circumstances under which he or she obtained alleged information. All five were experienced in the oil and gas industry, were in high

level positions, and interacted with Defendants or had first-hand knowledge of the development in the Class Period.   Their consistency and corroboration of each other's testimony enhance their reliability.

Moreover, Plaintiffs contend that Terwilliger had a personal financial motive to commit fraud.   He pledged approximately 8.1 million of his personal holdings of Houston American stock as collateral for other securities that he had purchased on margin. Thus he had a motive to keep the stock price high to avoid margin calls that could be triggered if the stock price declined.[31]   #44 at ¶ 21.   *See, e.g., Goldstein v. MCI WorldCom*, 340 F.3d 238, 250 (5th Cir. 2003).

Furthermore, Plaintiffs maintain, Defendants proposed competing inferences are not compelling and are facially less cogent that the strong inference of severe recklessness that arises

---

[31] The Court notes that "generalized financial motives will not support an inference of scienter." *Magruder v. Halliburton Co.* 2009 WL854656, at *8 (N.D. Tex. Mar. 31, 2009), *quoting Abrams*, 292 F.3d at 434 ("[T]he motives alleged in the complaint are not the types of motive that support a strong inference of scienter. The plaintiffs allege that the defendants were motivated to commit fraud by *the need to raise capital, the desire for enhanced incentive compensation, and the desire to sell stock at inflated prices*.   This court has held that similar allegations were insufficient to support an inference of scienter. . . . Absent an allegation that defendants profited from the inflated stock value or the offerings, such allegations fail." [emphasis added by *Magruder* court]).   The Fifth Circuit in *Abrams, id.*, opined, "Incentive compensation can hardly be the basis on which an allegation of fraud is predicated.   On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations."

from allegation in the Amended Complaint.  The fact the Defendants invested heavily in the Tamandua #1 well is not inconsistent with misrepresenting the results of the drilling.  Second they argue that the second test on the C9 formation conducted by Houston American and Gulf Energy at their own expense was a "Hail Mary," a reckless attempt to salvage the situation.

As for Defendants' assertion that warnings and cautionary disclosures weigh against inferring scienter, Plaintiffs argue that the warnings or disclosures do not relate to the alleged material misrepresentations.  The case is not about formation damage while drilling or the well being "shut-in."

Plaintiffs also insist that they have adequately pleaded loss causation under Fed. R. Civ. P. 8.  A complaint only needs to provide the defendant with "some indication of loss and the causal connection that the plaintiff has in mind." *Dura Pharm.*, 544 U.S. at 347; *Lormand*, 565 F.3d at 256.  The disclosure does not have to "reveal that the previous information was fraudulent, only that it was wrong." *TETRA*, 2009 WL 6325540 at *9.  Plaintiffs have alleged what is required:  a "facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss." *Lormand*

-75-

*v. U.S. Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009).   The pleading standard is not difficult to satisfy:   "Asking for plausible grounds for an element of a claim does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of that element."  *Id.* at 267, *quoting Twombly*, 550 U.S. at 545.   Furthermore, they only need to plead causation, not prove it.  *Erica P. John Fund*, 131 S. Ct. at 2183 (holding that securities fraud plaintiffs do not have to prove loss causation to obtain class certification).   Houston American's stock fell by 35.5% when it disclosed the closure of the Tamandua #1 well, the first indication that the statements about hydrocarbon shows and oil existing were misleading, and the investigation of it by the SEC.  #44 at ¶¶ 88, 110, 111.   The stock also dropped by 17.5% when Houston American disclosed on November 9, 2012 that the focus of the SEC investigation was its representations about the CPO 4 block's resource potential.   #44 at ¶ 112 and Federman Decl., Ex. C at 18.   The true test results were publicly exposed only by the filing of the complaint in this action on November 15, 2012.  *See Rubinstein*, 20 F.3d at 163-65, 70 (securities fraud was adequately alleged where defendant withheld adverse test results regarding oil discovery well).   Although Defendants claim that their March 29, 2010 disclosure that Houston American had only 1.2 million barrels of net proved reserves corrected its November 9, 2009 statement

that the CPO 4 block had 1 to 4 billion barrels of "estimated recoverable reserves, Plaintiffs point out that "proved reserves" are not comparable to "recoverable reserves."  The former is only a fraction of the "recoverable reserve" estimate.  Thus Defendants' disclosure on March 29, 2010 did not indicate that the statements about the larger "recoverable reserve" was false or misleading.  Furthermore, the market's reaction (stock price increased about $1.24 or 7% from the previous day's close) undercuts the inference that his information was a corrective disclosure.  Federman Decl. Ex. C at 3.

Finally Plaintiffs sufficiently pleaded control person liability under § 20(a) because they have alleged a primary violation and because they have alleged facts showing that the Individual Defendants controlled Houston American, knew of the falsity of the information being published, were in a position to prevent its dissemination, and caused Houston American to violate § 10(b) and Rule 10b-5.

### Defendants' Reply (#61)

Much of the Reply is redundant of arguments made in Defendants' motion to dismiss.

Emphasizing that pleading a securities fraud case must meet the specific requirements of the PSLRA and Rule 9(b), Defendants reiterate that Plaintiffs take statements out of context and conflate the drilling phase and the testing phase for the Tamandua

well to show that the statements during the drilling phrase about
hydrocarbon shows were false.  Defendants again highlight Houston
American's disclosure of numerous problems during the drilling
phase and warnings that success was not guaranteed.  Confidential
Witness 3, who was the only one of the five to be involved during
the drilling phase, acknowledged there were hydrocarbon shows, but
there is no indication that he shared his opinion with anyone else
working on the drilling or that anyone else agreed or disagreed
with him.   None of the Confidential Witnesses disputes that
hydrocarbon inflows necessitated shutting in the Tamandua well and
replacing surface equipment.  Furthermore Confidential Witnesses 4
and 5 did not join the project until the testing phase.
Confidential Witness 4 reached his conclusion about the
significance of the hydrocarbon shows after reviewing information
from the testing phase.  Although Plaintiffs argue that the test
results should be considered because there are no allegations that
Defendants' materially false or misleading statements ended in
2011, the only statements they challenge in 2012 relate to the
drilling phase, not the testing phase.   #44 at ¶¶ 98, 101.
Defendants insist that the Amended Complaint fails to plead
particularized facts showing that Houston American's statements
regarding the drilling phase of the Tamandua well were false or
fraudulent.

Maintaining that the Amended Complaint does not give rise to

a strong inference of scienter, Defendants argue that it does not describe any communications with Houston American about the disputed hydrocarbon shows or report that came to Houston American's attention that the shows were not "strong" or did not exhibit oil and gas.  The Amended Complaint only generally asserts that "daily reports" showed "everything that happened at the well."

As noted in footnote 10, Defendants contend that Plaintiffs' insistence that Houston American misled investors by using the term "reserves" because it had not yet drilled wells on CPO 4 at the time of the November 2009 estimate, even if Plaintiffs were correct that the term refers to the definition in the PRMS, Houston American made it clear that it had not yet drilled the first two exploratory wells.  There is no strong inference of an intent to defraud where the defendants voluntarily disclose in the same presentation the very information that Plaintiffs argue shows that part of the presentation was false or misleading.

Moreover Defendants assert that they have shown overwhelming competing inferences under *Tellabs* that Terwilliger and Jacobs did not act fraudulently and that Plaintiffs only conclusorily assert that these competing inferences are not compelling.  Plaintiffs fail to explain, no less allege facts showing, why Houston American would make positive statements about a well it knew would fail a few months later, or spend tens of millions of dollars drilling and testing the well, including approximately $5 million at its own

expense after SK gave up.  They speculate the second test was a "Hail Mary" but allege no facts to support that speculation. Although Plaintiffs claim that Houston American made the false statements to inflate Houston American's share price, the fact remains that Jacobs never sold any of his stock and Terwilliger sold stock only after the well failed and the share price declined. No Defendants are alleged to have sold any stock during the lengthy two-and-a-half-year putative class period.  *Zonagen*, 267 F.3d at 420-21 ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claims"), *quoting Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995).  Since completion of the drilling established a definite end date for any alleged fraud, if a defendant believed the well would fail, he would be in a much better position by selling the stock before that point.  Plaintiffs cite no authority for their argument that Terwilliger had a motive to commit fraud because he pledged his Houston American shares as collateral for other securities.[32]

Defendants repeat that the November 2009 estimate is a

---

[32] The Court agrees that such generalized financial motives are insufficient to support an inference of scienter.  *Abrams*, 292 F.3d at 434.  Nevertheless as noted previously, in *Tellabs*, 551 U.S. at 325, Justice Ginsburg wrote for the majority of the Supreme Court, "While it is true that motive can be a relevant consideration and personal financial gain may weigh heavily in favor of a scienter inference, . . . the absence of a motive allegation is not fatal. . . . [A]llegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint."  *In accord, In re Franklin Bank Corp.*, 782 F. supp. 2d at 377.

forward-looking statement protected by safe harbor, 15 U.S.C. § 77z-2, because it is a statement of future performance: one cannot determine whether the estimate will prove correct until future drilling activities are complete. Meaningful cautionary language is present in Houston American's annual report, which contains nine pages of detailed industry-specific risk disclosures, none of which are addressed by Plaintiffs. Nor do Plaintiffs specify what risks had begun to materialize in November 2009 and whether they were included in those detailed and specific risk disclosures. Third, the adequacy of Houston American's warnings can be determined at the pleading stage. *See, e.g., Home Solutions of America Investor Group v. Fradella*, Civ. A. No. 3:06-CV-1096-N, 2008 WL 1744588, *6 (N.D. Tex. Mar. 24, 2008)("Courts in this district have routinely found the safe harbor applicable when the required 'meaningful cautionary language' was contained in SEC filings that were incorporated by reference.").

Defendants again insist that the claim based on the November 2009 estimate is time-barred because it was not asserted within two years of discovery of the facts constituting the alleged violation. It was misleading because the information that Plaintiffs use to support their argument, i.e., that Houston American did not have one to four billion barrels in "reserves" as defined by the PRMS because it had not yet drilled wells or conducted formation tests on CPO 4 and thus could not have reserves at that time, is clear

from the November 2009 presentation itself.

Defendants reiterate that Plaintiffs have not pleaded loss causation because they do not allege any disclosures about the Tamandua well that inflated the value of America's stock; although such an allegation though not sufficient by itself, it is a required element.[33]   *Dura Pharm.*, 544 U.S. at 347 (complaint that merely alleges plaintiffs paid "artificially inflated price" fails to state a claim).   They do not allege that statements about the well, specifically about the hydrocarbon shows, inflated the price of Houston American's stock.   Plaintiffs did not plead but now argue that the April 19, 2012 announcement of the closure of the Tamandua well was "the first hint" that the hydrocarbon statements

---

[33] Defendants misrepresent the requirements of loss causation. In its most recent opinion, *Erica P. John Fund, Inc. v. Halliburton Co.*, 718 F.3d 423, 434 (5th Cir. 2012), the Fifth Circuit wrote,

> Although the 10b-5 fraud action does not expressly require proof of price impact as an element of the claim, a plaintiff must nevertheless prevail on this fact in order to establish another element on which the plaintiff does bear the burden of proof:  loss causation.  As the [Supreme Court in *Erica P. John Fund, Inc. v. Halliburton Co. Fund*, 131 S. Ct. 2179 (2011)] stated, "'Price impact' simply refers to the effect of a misrepresentation on the stock price," 131 S. Ct. at 2187.  Price impact can be shown **either** by an increase in price following a fraudulent public statement **or a decrease in price following a revelation of the fraud** [emphasis added by this Court].

"In other words, proof of a fraudulently inflated purchase price only satisfies reliance; loss causation requires going a step further to supply 'the logical link between the inflated share price and any later economic loss." *FindWhat*, 658 F.3d at 1311, *quoting Dura Pharms.*, 544 U.S. at 342.

were allegedly false or misleading and that "the true nature of the test results were finally publicly exposed only by the filing of the Complaint on November 15, 2012."   Pl.s' Opp., #54 at 40. Plaintiffs fail to assert that the 2012 press releases announcing unsuccessful testing on the Tamandua well corrected any statements about hydrocarbon shows observed while drilling.   Thus they fail to plead loss causation with respect to this claim.[34]   Although the stock closed two cents lower on November 16, 2012, it closed three cents higher on the next trading day.   Ex. M.   In sum, argue Defendants, there is no inflation on the front end and no

_____

[34] As noted *supra*, "[L]oss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation." *Lormand*, 565 F.3d at 261.  Defendants' challenge to this single, final disclosure ignores the gradual series of disclosures pleaded by Plaintiffs and the price impact on Houston American's stock.   Plaintiffs allege that Houston American's press release on April 4, 20012 disclosing that formation damage to the C9 and C7 was delaying drilling and testing on the Tamandua #1 well. #44, ¶ 108.   Following this disclosure that same day Houston American's stock fell $0.11, and continued to fall for the next three trading days until it closed at $3.67 on April 10, 2012. *Id.* at ¶ 109.   On April 19, 2012 Houston American's stock fell by 35.5% to close at $2.25 per share when it disclosed the closure of the Tamandua #1 well, the first indication that the statements about hydrocarbon shows and oil existing were misleading, and that it was being investigated by the SEC.   #44 at ¶¶ 110, 111.  The stock also dropped by 17.5% when Houston American disclosed on November 9, 2012 that the focus of the SEC investigation was its representations about the CPO 4 block's resource potential.   #44 at ¶ 112 and Federman Decl., Ex. C at 18. Finally Plaintiffs allege that the true test results were publicly exposed only by the filing of the complaint in this action on November 15, 2012.  By the final disclosure, the substantial impact on the price of the stock had already occurred.  Moreover the Fifth Circuit requires only notice pleading under Rules 8(a) and 12(b)(6), not heightened pleading, for loss causation.

correction on the back end, and thus no loss causation.

As for the November 2009 resource estimate, Defendants contend that it is not plausible that investors were under the impressions that Houston American had 1-4 billion barrels of "reserves" as defined by the PRMS.  Moreover none of the disclosures cited by Plaintiffs correct this misimpression.  Neither of two articles cited by Plaintiffs suggest that anyone ever believed that Houston American's estimate referred to the PRMS reserves based on actual production or formation tests.  #54 at p. 41; #44, ¶¶ 75, 79.  It is also not plausible that the two disclosures they cite concerning the SEC investigation in April and November 2012 revealed any "truth" about the November 2009 estimate that caused the share price to fall.  The April 2009 disclosure does not state anything about the November 2009 estimate.  The "17.5%" drop that Plaintiffs refer to in November 2012 is actually a 10-cent drop at a time when Houston American's share price had already lost most of its value. *See In re Redback Networks Sec. Litig.*, Bo. C 03-5642 JF (HRL), 2007 WL 4259464, at *5 (N.D. Cal. Dec. 4, 2007)("Defendants respond, correctly, that Plaintiffs must do more than give 'some indication' of what a causal connection 'might be,' and that Plaintiffs must show a *plausible* factual theory of the causal connection between the alleged misrepresentations and the claimed loss.").

Defendants maintain that the bottom line is the "Houston

-84-

American's share price declined because a risk Houston American disclosed and that was well known--that Houston American may not discover commercially viable hydrocarbons in the Tamandua well--came to fruition.  The Amended Complaint fails to allege that any decline following the materialization of this known risk is attributable to a purportedly false statement by Houston American, and therefore fails to plead loss causation."  #61 at p. 17.

### Court's Decision

After considering the allegations in the Amended Complaint as a whole, although a close question, the Court finds that Defendants' motion to dismiss should be granted.

There is no dispute that the challenged misrepresentations or omissions are material.  Plaintiffs have specified each statement, the date and place the statements were made, who made them or who signed the relevant SEC-filed document, and explained why they find that the statement was misleading, as required by the PSLRA, 15 U.S.C. § 78u-4(b)(1) by showing what the real situation in the well drilling allegedly was before or at the time each statement was made.

Although Plaintiffs have not pleaded a cognizable motive of personal financial gain for Defendants' alleged material misstatements and omissions, with regard to establishing scienter, an unusual and, in this action, a very significant factor is highlighted by Plaintiffs.  Houston American is a very small

company with only three employees:  Houston American's President
and Chairman of the Board of Directors Terwilliger, its Chief
Financial Officer Jacobs, and Senior Vice President of Exploration
Jeffers.  The suit focuses on the first and only well that this
small company, with two partners, was drilling at the time on the
CPO 4 block, the Tamandua #1.  Moreover, to oversee and direct that
project Houston American established two small committees:  (1) the
management committee, composed of only six people and charged with
making the decisions about exploration, drilling and production on
the CPO 4 block, as well as how deep to drill, and (2) the
technical committee, composed of only 7 individuals.  Houston
American's only three employees, Terwilliger, Jacobs and Jeffers,
sat on both committees.  As pleaded by Plaintiffs, the five
Confidential Witnesses were each hired for their experience and
expertise in drilling such wells.  Confidential Witness 3, a
geophysicist and Senior Vice President of Americas for SK
Innovation Co. from January 2011 (prior to the commencement of the
drilling) to June 2012, was responsible for managing the drilling
operation of the CPO 4 block, and also sat on both the management
committee and the technical committee.[35]  Confidential Witness 3

---

[35] Another of the seven members of the technical committee was
Confidential Witness 4, SK's drilling manager, from January 2012.
According to the Amended Complaint, after reviewing the geological
tests and records, he  corroborated the testimony of Confidential
Witness 3 that there were never strong shows of hydrocarbons nor an
indication of gas and oil in the Tamandua #1 well.

testified that the members of the technical committee met regularly in Houston to review the progress at the CPO 4 block and to discuss the next steps, communicating almost daily by phone and email. Plaintiffs allege that the management committee purportedly disagreed about how to proceed with drilling in the CPO 4 block, and Confidential Witness 3 reported that he had disagreements with Houston American and that the partners also disagreed about where to drill the wells and about economic justification for drilling them, with SK less optimistic than Houston American about the prudence of doing so based on Confidential Witness 3's review of the seismic data.  Confidential Witness 3 stated that the well bit got stuck repeatedly and the engineers were unable to determine why, so finally the management committee **unanimously** chose to sidetrack the well twice even though sidetracking increased the cost.  The Court finds that it is not reasonable that, with so few members, each either a key player in the partner companies or an experienced expert in the industry, the two committees did not thoroughly discuss the problems with the drilling of the Tamandua #1 well and/or that all the members were not fully apprised of the specific details of the actual situation when the challenged disclosures to potential investors were made about the drilling of the well.  *See Nathenson*, 267 F.3d at 424-25 (although normally an officer's position in a company is not sufficient to create the

requisite  inference  of  scienter,[36]  the  court  found  from  a
combination of special circumstances that an officer's position in
a defendant company may create an inference of scienter when the
company  is  a  small,  one-product  company  devoting  most  of  its
efforts and expenditures to that product with its future prospects
substantially dependent on it). All the alleged misrepresentations
and  omissions  were  made  by  Terwilliger  and  Jacobs.    Thus  an
inference  of  scienter  as  to  these  two  Individual  Defendants  could
arise from the pleadings, based on specific information purportedly
shared  and  argued  about  among  the  few  committee  members  and
testified  to  by  the  Confidential  Witnesses,  but  misrepresented  in
Houston American's press releases and SEC filings.

     Nevertheless, as the Supreme Court held in *Tellabs*, 127 S. Ct.
at 2510,

> The  strength  of  an  inference  cannot  be  decided  in  a
> vacuum.    The  inquiry  is  inherently  comparative"   How
> likely  is  it  that  one  conclusion,  as  compared  to  others,
> follows  from  the  underlying  facts?   To  determine  whether
> the  plaintiff  has  alleged  facts  that  give  rise  to  the
> requisite  "strong  inference"  of  scienter,  a  court  must
> consider  plausible,  nonculpable  explanations  for  the
> defendant's  conduct,  as  well  as  inferences  favoring  the
> plaintiff. . . . [T]he  inference  of  scienter  must  be  more
> than  "reasonable"  or  "permissible"--it  must  be  cogent  and
> compelling,  thus  strong  in  light  of  other  explanations.
> A  complaint  will  survive,  we  hold,  only  if  a  reasonable
> person  would  deem  the  inference  of  scienter  cogent  and  at
> least  as  compelling  as  any  opposing  inference  one  could

---

[36] *See,  e.g.,  Indiana  Elec.  Workers'*,  537  F.3d  at  535
("'pleading[s]  of  scienter  may  not  rest  on  the  inference  that
defendants  must  have  been  aware  of  the  misstatement  based  on  their
positions  with  the  company.'"),  *citing  Abrams*,  292  F.3d  at  432.

draw from the facts alleged.

Taking all the pleaded facts as true, the Court finds that, along with the absence of a motive of personal gain, the obstacle to finding this inference of scienter as compelling in comparison with other explanations, is Houston American's decision, despite the Confidential Witnesses' conclusions and SK's resulting withdrawal, to spend another $5 million for more testing of the well after the first testing produced negative results according to the Amended Complaint's allegations.   So, too, does SK's decision after the first testing to abandon the Tamandua well #1, but to remain committed to drilling another in the CPO 4 block.  The Court agrees with Defendants that Plaintiffs' explanation that Houston American's decision to continue testing the well was a desperate "Hail Mary" decision does not make sense for a small company whose President and Chief Financial Officer, Terwilliger and Jacobs, knowingly made the statements alleged to be false or misleading.

Furthermore Plaintiffs fail to address whether the alleged misstatements or omissions were the actual cause of their economic loss as opposed to other explanations, e.g., changed economic circumstances or investor expectations or industry-specific facts. *Dura Pharms.*, 544 U.S. at 34.

Because Plaintiffs fail to state a primary violation of § 10(b) of the Exchange Act and Rule 10b-5, their claim for control person liability under § 20 also fails.

Because the law relied upon by the Court in reaching its decision is established and clear and because Plaintiffs have already been given an opportunity to amend in filing the governing complaint, the Court finds granting another leave to amend would be futile.  Accordingly, the Court

ORDERS that Defendants' motion to dismiss for failure to state a claim (#53) is GRANTED and this action is DISMISSED.

**SIGNED** at Houston, Texas, this ___22nd___ day of ___August___, 2013.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE